```
                                    F I L E D
                              CLERK, U.S. DISTRICT COURT

                                  7/14/2022

                              CENTRAL DISTRICT OF CALIFORNIA
                              BY: _____VAV_____ DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2022 Grand Jury

| UNITED STATES OF AMERICA, | CR  2:22-cr-00312-MEMF |
|---|---|
| Plaintiff, | I N D I C T M E N T |

v.

ELISEO LUNA,
  aka "Chilo,"
  aka "Crazy,"
  aka "Toca,"
  aka "El Abogado,"
  aka "Roberto Acosta,"
DIONICIA ROMAN,
  aka "D,"
  aka "Dee,"
  aka "Coco,"
JORGE LINARES,
  aka "Goofy,"
EDUARDO LUNA,
  aka "Flaco,"
  aka "Cesar Lopez,"
RENE LUNA SANCHEZ,
  aka "Seis,"
  aka "6,"
  aka "Huero,"
  aka "Guero,"
  aka "Bon Bon,"
MOISES ALONSO,
  aka "Raskal,"
MARCO ANTONIO PONCE,
  aka "Largo,"
  aka "Mario Antonio Ponce,"
LUIS ALBERTO LUNA,
  aka "Pulga,"
  aka "Flea,"

[18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. § 1951(a): Hobbs Act Robbery; 21 U.S.C. § 846: Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances; 21 U.S.C. §§ 841(a), (b)(1)(A)(i), (b)(1)(A)(viii), (b)(1)(B)(viii): Distribution and Possession with Intent to Distribute Controlled Substances; 18 U.S.C. §§ 924(c)(1)(A)(ii), (iii), (c)(1)(C)(i); Use, Carry, Brandish, and Discharge, During and in Relation to, and Possession of, a Firearm in Furtherance of, a Crime of Violence and a Drug Trafficking Crime; 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms and Ammunition; 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Dealing in Firearms Without a License; 18 U.S.C. § 3: Accessory After the Fact; 18 U.S.C. §§ 1963, 981, and 924, 21 U.S.C. § 853, 28 U.S.C. § 2461(c): Criminal Forfeiture]

KEVIN BUTLER,
   aka "Whiteboy,"
BOBBY EDWARDS,
   aka "Negro,"
MARIO ESPARZA,
   aka "Bullet,"
DENISE ELIAS,
   aka "Innocent,"
   aka "Hennessy,"
JEREMIAH ENGLISH,
   aka "Jay,"
   aka "J,"
JOSE ALONSO,
   aka "Gordo,"
DAVID ALONSO,
   aka "Big Raskal,"
DZHAMIL KHASILOV,
   aka "Ponytail,"
JUSTIN GUTIERREZ,
   aka "Active," and
DAVID ZAMBRANO,

        Defendants.

The Grand Jury charges:

GENERAL ALLEGATIONS

At times relevant to this Indictment:

A.  THE RACKETEERING ENTERPRISE

1.  Defendants ELISEO LUNA, also known as ("aka") "Chilo," aka "Crazy," aka "Toca," aka "El Abogado," aka "Roberto Acosta" ("ELISEO LUNA"), DIONICIA ROMAN, aka "D," aka "Dee," aka "Coco" ("ROMAN"), JORGE LINARES, aka "Goofy" ("LINARES"), EDUARDO LUNA, aka "Flaco," aka "Cesar Lopez" ("EDUARDO LUNA"), RENE LUNA SANCHEZ, aka "Seis," aka "6," aka "Huero," aka "Guero," aka "Bon Bon" ("SANCHEZ"), MOISES ALONSO, aka "Raskal" ("M. ALONSO"), MARCO ANTONIO PONCE, aka "Largo," aka "Mario Antonio Ponce" ("PONCE"), LUIS ALBERTO LUNA, aka "Pulga," aka "Flea" ("LUIS LUNA"), KEVIN BUTLER, aka "Whiteboy" ("BUTLER"), BOBBY EDWARDS, aka "Negro" ("EDWARDS"), MARIO ESPARZA, aka "Bullet" ("ESPARZA"), DENISE ELIAS, aka "Innocent," aka "Hennessy" ("ELIAS"),

JEREMIAH ENGLISH, aka "Jay," aka "J" ("ENGLISH"), JOSE ALONSO, aka "Gordo" ("J. ALONSO"), DAVID ALONSO, aka "Big Raskal" ("D. ALONSO"), DZHAMIL KHASILOV, aka "Ponytail" ("KHASILOV"), JUSTIN GUTIERREZ, aka "Active" ("GUTIERREZ"), and DAVID ZAMBRANO ("ZAMBRANO"), and others known and unknown to the Grand Jury, were members and associates of the Eastside Playboys Street Gang ("Playboys"), a criminal organization operating in and around Los Angeles, California whose members and associates engaged in, among other things, numerous acts of violence and other crimes, including murder, robbery, extortion, and drug trafficking.  Playboys operated within the Central District of California and elsewhere.  Playboys, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity, which was engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

B.   BACKGROUND OF THE RACKETEERING ENTERPRISE

2.   Playboys was a criminal street gang formed in the 1970s, and had over 350 documented members at the time of this Indictment. Playboys claimed territory in the City of Los Angeles bounded by Slauson Avenue to the South, Vernon Avenue to the North, Central Avenue to the East, and the 110 Freeway to the West – an area known as "South Park."

3.   In order to enforce control over its territory, Playboys used methods to identify its territory and to intimidate other gangs and the local community by indicating that specific territory was

1  controlled by Playboys.  Such methods included the use of graffiti to
2  mark the area controlled by the gang.  Specifically, the gang
3  graffiti, in conjunction with the gang's reputation for violence, was
4  intended to intimidate rival gangs, drug dealers, and neighborhood
5  residents.  Playboys' graffiti also informed other gangs and
6  residents that the defaced areas are "controlled and inhabited" by
7  Playboys, meaning that Playboys was the only gang allowed to sell
8  drugs and "hang out" in this territory claimed by Playboys.  In sum,
9  the graffiti created an atmosphere of fear and intimidation in the
10  community.

11      4.   Playboys was under the control of the "Mexican Mafia," or
12  "La Eme."  The Mexican Mafia was a criminal organization that
13  operated within the California state prison system, the federal
14  prison system, and the streets and suburbs of large cities throughout
15  Southern California.  Members of the Mexican Mafia came from the
16  ranks of local street gangs, including Playboys.  In exchange for
17  allowing local street gangs to maintain control over their
18  territories, and in return for ensuring the safety of the gangs'
19  members and associates during periods of incarceration, the Mexican
20  Mafia required the gangs to collect and pay "rent" or "taxes" on all
21  drug trafficking and other illicit and illegal conduct, as well as
22  some of the legitimate business taking place in those territories.
23  These illicit funds were intended to be controlled by, and were often
24  held in trust by, gang members and associates for the Mexican Mafia
25  member(s) in charge of a particular area.  Members and associates of
26  the Playboys, therefore, regularly paid taxes to the Mexican Mafia
27  members who oversaw the gang; and the collection of taxes from drug
28  dealers and others engaged in illicit activities as well as

legitimate businesses operating within Playboys' territory was a primary task of the gang's leadership on the streets, as was punishing individuals who failed to pay the requisite taxes.

5.   Mexican Mafia Member number 1, also known as the "Big Rabbit" ("MM-1") was the incarcerated Mexican Mafia member who maintained a leadership role over the Playboys and affiliated gangs. MM-1 is currently serving a term of life imprisonment for second degree murder.

6.   The Mexican Mafia invited some incarcerated Playboys members to join its leadership as "shot callers."  In this role, those Playboys members who were chosen to participate in managerial roles for the Mexican Mafia completed various tasks, including, but not limited to, carrying out orders of discipline and/or determining who will carry out orders of discipline, representing the Mexican Mafia amongst other leaders of the prison/custodial facility, and ensuring that Playboys members, and other Hispanic gang members under their control, follow the Mexican Mafia's code of conduct. Additionally, incarcerated Playboys members could still actively participate in Playboys' activities outside of prison, including contributing rent money to their respective cliques, hearing disputes between Playboys members and cliques, determining and/or agreeing or disagreeing with punishment, and ordering discipline for violating the Mexican Mafia's and Playboys' codes of conduct.  While incarcerated, Playboys members followed the Mexican Mafia's code of conduct.  Defendant LINARES was one such incarcerated Playboys member, and he directed the activities of Playboys on the street.

7.   Playboys operated through subsets known as "cliques," which were usually named for a street within a clique's territory, or for

5

the neighborhood in which the clique operated.  Playboys had
approximately seven cliques operating in Los Angeles based on
location, including, but not limited to, the 35th Street, 42nd
Street, 43rd Street, 46th Street, 49th Street, 51st Street, and 56th
Street cliques.  Each clique typically had its own leader(s), or
"shot callers," at any given point.  These individuals were
responsible for, among other things, managing the drug trafficking
operation in the clique's territory, collecting money, directing the
day-to-day management of the clique, enforcing Playboys' and the
Mexican Mafia's codes of conduct, resolving intra-clique disputes,
and representing their respective cliques in discussions with more
senior Playboys members.  At various times throughout this
conspiracy, the following defendants were shot callers of Playboys'
cliques:  Defendant ELISEO LUNA for 46th Street Clique, defendant M.
ALONSO for 43rd Street Clique, and defendant EDWARDS for 35th Street
Clique.  Playboys' shot callers were also responsible for meeting
with other clique leaders in order to achieve their common criminal
purposes and to resolve disputes between the cliques.

8.   Playboys members sometimes signified their membership with
tattoos reading "Playboys," "PBS," "ES," the Playboy bunny symbol, or
other variations of the gang's name, streets, or cliques.  Playboys
referred to each other collectively as "Rabbits" or "Rabbit Gang" and
referred to themselves and to other individual members by their
monikers, or nicknames, and often did not know fellow gang members'
legal names.

9.   Playboys was continually engaged in the distribution of
multiple controlled substances, including, but not limited to,
methamphetamine, heroin, cocaine, fentanyl, and marijuana.  In

addition to supplying drug-using customers, members and associates of the Playboys regularly sold distribution quantities of drugs to each other and to others who they believed to be "street-level" drug dealers.

10.  To support their drug trafficking and racketeering activities, and to maintain control over their claimed "territory," Playboys members and associates maintained a ready supply of firearms, including handguns and rifles, which were valued and shared among Playboys members.  Playboys also sold such weapons for profit. Firearms were often discarded or destroyed after being used to commit acts of violence on behalf of the enterprise, so the Playboys regularly engaged in continued gun trafficking to ensure that members maintain ready access to firearms at all times.  Being publicly known to sell, and therefore possess, numerous firearms served the additional purpose of supporting the Playboys' reputation for violence and intimidation within the general community, among those who attempted to do illicit or legitimate business in Playboys' territory, and with respect to rival gang members.  The prolific possession of firearms allowed Playboys to maintain exclusive control of its territory for illicit purposes.

11.  Playboys' regular tax payment to the Mexican Mafia came from Playboys' cliques and was typically paid by the overall Playboys leader.  Playboys obtained its regular tax payment from each of Playboys' cliques on a pre-determined basis.  Playboys' overall leader(s) and clique leaders were involved in the coordination of tax collection throughout the territory Playboys controlled. Additionally, each clique leader was responsible for collecting money, in the form of gang "dues," from each clique member in order

to pay each clique's allotted monthly or yearly payment to the Mexican Mafia. Failure to pay Mexican Mafia taxes could result in discipline.

12. Playboys had a self-imposed code of conduct, which was imposed and enforced to maintain compliance among its members. Playboys also adopted and enforced the Mexican Mafia's rules. Playboys enforced its rules and promoted discipline among its members by imposing monetary fines and threatening and committing acts of violence against members who break the rules.

13. Playboys had zero tolerance for members and associates who cooperated with law enforcement. Once Playboys had evidence that someone had cooperated with law enforcement, by receiving and reviewing law enforcement reports or videos of interviews, Playboys leadership would order discipline of that person, or would issue a "green light" as to that person, which was an order that if any Playboys member sees the person who was allegedly or actually cooperating with law enforcement, that person was to be killed on sight.

14. Playboys members also engaged in acts of violence against members of the community and rival gang members in its territory. Participation in violent acts increased the respect accorded to members who commit violent acts. Additionally, commission of violent acts by Playboys members enhanced the gang's overall reputation for violence in the community, resulting in the intimidation of citizens in Playboys' territory and instilling fear in those who might otherwise report the gang's criminal conduct, which further facilitated future criminal behavior by the gang's members. For example, Playboys members have committed numerous murders and other

violent assaults in recent years as a result of gang rivalries, retaliation for testifying against Playboys members in legal proceedings, drive-by shootings, and assaults on law enforcement officers.  These murders and violent assaults served to perpetuate Playboys' reputation for violence and reinforces their control of their territory.

15.  Drug sales provided the bulk of Playboys' profits.  As long as Playboys paid its taxes to the Mexican Mafia, Playboys members and associates were authorized, exclusively, to sell drugs in Playboys-controlled territories.  Individual Playboys members who sold drugs were often required to provide a portion of their drug proceeds to the shot caller of the clique.  This money was used by the shot caller for a variety of purposes, including paying the clique's rent to the overall Playboys leader and thus the Mexican Mafia, paying legal fees for Playboys members, and purchasing weapons that were maintained by the clique in their territory for protection.  If a clique member earned money for the clique by selling drugs or other criminal ventures, and contributed a portion to the shot caller, this money was often considered their rent contribution to the clique.

16.  Playboys also derived income from the extortion of businesses and vendors who operated in Playboys-controlled territory.  On a clique level, the clique shot caller identified targets for extortion and coordinates which clique member was authorized to collect extortion from each vendor.  Playboys extorted both legitimate and illegitimate businesses alike, though Playboys tended to focus on illegitimate or "grey-market" businesses.  These businesses were often owned or run by illegal immigrants, who rarely reported this extortion to law enforcement, despite the threats of

violence that accompany the extortion.  In exchange for the extortion payments, Playboys offered "protection" to the business from other gang members.

C.   <u>PURPOSES OF THE ENTERPRISE</u>

17.  The purposes of the Playboys enterprise included, but were not limited to, the following:

a.   Enriching members and associates of the Mexican Mafia, including MM-1 and defendant LINARES, through criminal activities, including drug sales, gun sales, and extortion, as well as the remittance of proceeds generated as a result of Playboys' criminal activities (referred to as "taxes");

b.   Enriching the members and associates of the Playboys through, among other things, the control of, and participation in, the trafficking of controlled substances and firearms in Playboys territory and elsewhere, and the collection of extortionate taxes;

c.   Preserving, promoting, and protecting the power, territory, and profits of Playboys and its members and associates, through threats of violence and actual acts of violence, including robbery, extortion, assault, and murder;

d.   Exposing and punishing Playboys members and associates who are perceived to have violated Playboys' and the Mexican Mafia's codes of conduct;

e.   Maintaining Playboys' control and authority over its territory, often through threats, intimidation and acts of violence committed against local residents and rival gangs; and

f.   Violently retaliating against rival gang members or perceived outsiders who challenge Playboys' authority or who fail to pay debts owed to Playboys members and associates.

D. THE MEANS AND METHODS OF THE ENTERPRISE

18. The means and methods by which defendants and other members and associates conducted and participated in the affairs of the Playboys criminal enterprise included the following:

a. Members and associates of the enterprise conspired to commit, attempted, and committed, acts of violence to protect and expand the enterprise's criminal operation, including assault and murder, directed against rival gang members, neighborhood residents and visitors, and to violently discipline insubordinate members of the enterprise;

b. Members and associates of the enterprise acquired, possessed, carried, and used deadly weapons, including firearms, which members and associates used to threaten rivals, the public, and even their own members, in the course of the criminal enterprise's criminal activities;

c. Members and associates of the enterprise promoted a climate of fear in the community through threats of harm and violence and actual harm and violence;

d. Members and associates of the enterprise participated in drug trafficking, including the purchase and sale of controlled substances, as well as firearms sales, robberies, burglaries, and the collection of extortionate taxes from businesses and vendors to generate income;

e. Members and associates of the enterprise stored drugs and firearms at locations within Playboys gang territory, including illegal marijuana dispensaries located at a residence at 4607 S. Avalon Blvd. (the "4607 dispensary") and a car wash at 181 East

1   Vernon Ave. (the "Car Wash dispensary") (collectively, the "marijuana
2   dispensaries");

3          f.   Members and associates of the enterprise frequently
4   engaged in the aforementioned criminal activities in the presence of
5   other Playboys gang members and/or associates in order to enhance the
6   status within Playboys of those affirmatively conducting criminal
7   acts;

8          g.   Members and associates of the enterprise used various
9   techniques to avoid law enforcement scrutiny of the enterprise's
10  criminal activities and to evade and frustrate law enforcement, such
11  as the use of coded language to discuss criminal activities and other
12  counter-surveillance techniques; and

13         h.   Members and associates of the enterprise protected and
14  strengthened Playboys' standing by following the direction of the
15  Mexican Mafia leadership; by corresponding with members of Playboys
16  and the Mexican Mafia through prison visits, telephone calls, and
17  written correspondence; by remitting portions of drug sales and other
18  illegal activities ("taxes") to Mexican Mafia members and associates;
19  and by carrying out violent acts against targets designated by
20  Mexican Mafia members and associates.

21
22
23
24
25
26
27
28

1                        COUNT ONE

2                  [18 U.S.C. § 1962(d)]

3    [DEFENDANTS ELISEO LUNA, ROMAN, LINARES, EDUARDO LUNA, SANCHEZ,

4             M. ALONSO, PONCE, LUIS LUNA, AND EDWARDS]

5     Paragraphs 1 through 18 of the General Allegations of this

6 Indictment are re-alleged and incorporated here.

7 A.   OBJECT OF THE RACKETEERING CONSPIRACY

8     Beginning on a date unknown to the Grand Jury, but no later than

9 on or about October 5, 2018, and continuing to the date of this

10 Indictment, in Los Angeles County, within the Central District of

11 California, and elsewhere, defendants ELISEO LUNA, also known as

12 ("aka") "Chilo," aka "Crazy," aka "Toca," aka "El Abogado," aka

13 "Roberto Acosta" ("ELISEO LUNA"), DIONICIA ROMAN, aka "D," aka "Dee,"

14 aka "Coco" ("ROMAN"), JORGE LINARES, aka "Goofy" ("LINARES"), EDUARDO

15 LUNA, aka "Flaco," aka "Cesar Lopez" ("EDUARDO LUNA"), RENE LUNA

16 SANCHEZ, aka "Seis," aka "6," aka "Huero," aka "Guero," aka "Bon Bon"

17 ("SANCHEZ"), MOISES ALONSO, aka "Raskal" ("M. ALONSO"), MARCO ANTONIO

18 PONCE, aka "Largo," aka "Mario Antonio Ponce" ("PONCE"), LUIS ALBERTO

19 LUNA, aka "Pulga," aka "Flea" ("LUIS LUNA"), and BOBBY EDWARDS, aka

20 "Negro" ("EDWARDS"), and others known and unknown to the Grand Jury,

21 being persons employed by and associated with the Playboys criminal

22 enterprise, an enterprise which was engaged in, and the activities of

23 which affected, interstate and foreign commerce, knowingly and

24 intentionally conspired to violate Title 18, United States Code,

25 Section 1962(c), that is, to conduct and participate, directly and

26 indirectly, in the conduct of the affairs of that enterprise through

27 a pattern of racketeering activity, as that term is defined in Title

28 18, United States Code, Sections 1961(1) and 1961(5), consisting of:

1        1.    Multiple acts involving murder, in violation of California

2   Penal Code Sections 21a, 31, 182, 187, 189, and 664;

3        2.    Multiple acts involving extortion, in violation of

4   California Penal Code Sections 21a, 31, 182, 518, 519, 520, and 664;

5        3.    Multiple acts involving robbery, in violation of California

6   Penal Code Sections 21a, 31, 182, 211, 212, 212.5, 213, and 664;

7        4.    Multiple acts indictable under Title 18, United States

8   Code, Section 1951 (relating to interference with commerce by robbery

9   or extortion); and

10        5.    Multiple offenses involving trafficking in controlled

11   substances, in violation of Title 21, United States Code, Sections

12   841(a)(1) and 846;

13        It was a further part of the conspiracy that each defendant

14   agreed that a conspirator would commit at least two acts of

15   racketeering activity in the conduct of the affairs of the

16   enterprise.

17   B.   MEANS BY WHICH THE OBJECT OF THE RACKETEERING CONSPIRACY WAS TO

18        BE ACCOMPLISHED

19        The object of the conspiracy was to be accomplished, in

20   substance, as follows:

21        1.    MM-1 and others known and unknown to the Grand Jury would

22   exercise leadership over the Playboys on behalf of the Mexican Mafia

23   from within prison by issuing rules and orders to defendant ROMAN and

24   others known and unknown to the Grand Jury, regarding, among other

25   things, the collection of taxes, the distribution of controlled

26   substances, and the decisions regarding who held positions of

27   authority within the Playboys out on the streets.

28

14

2.    Defendant ROMAN would act as a secretary for MM-1, and would oversee the collection of taxes in the form of drug and gun proceeds and extortion payments from Playboys territory to be paid to MM-1 and other Mexican Mafia members.

3.    Defendant ROMAN, and others known and unknown to the Grand Jury, would communicate telephonically with defendants ELISEO LUNA and SANCHEZ, and others known and unknown to the Grand Jury, to give directions regarding the business of the Playboys.

4.    Defendant LINARES would direct the activities of Playboys members and associates from jail, collect taxes from various Playboys members and associates on behalf of the Mexican Mafia, and order physical discipline up to and including attempted murder and murder of Playboys members who violated Playboys or Mexican Mafia rules, as well as gang rivals who encroached upon Playboys or associates' territories or exhibited disrespect towards Playboys members or associates.

5.    Defendant LINARES would interface between incarcerated Mexican Mafia members and Playboys members and associates on the streets, passing along information, instructions, and orders.

6.    Defendant ELISEO LUNA would be the overall shot caller for Playboys on the street.  As the overall shot caller, ELISEO LUNA would oversee the Playboys' drug trafficking activities, disseminate orders to Playboys' general leadership and membership, and authorize the assault and murder of members who were in bad standing with Playboys.

7.    Defendants ELISEO LUNA, M. ALONSO, and EDWARDS, and others known and unknown to the Grand Jury, would act as shot callers of Playboys' cliques, with responsibility over their respective clique's

day-to-day activities, including rent collection, drug trafficking, maintaining the clique's firearms, directing violence against members of the community, ensuring their clique's rent was paid to the Mexican Mafia, ordering discipline of clique members who violated Playboys' code of conduct, and maintaining and/or expanding his clique's territory.

8.    Defendants ELISEO LUNA, ROMAN, LINARES, EDUARDO LUNA, SANCHEZ, M. ALONSO, and EDWARDS, and others known and unknown to the Grand Jury, would direct Playboys members to commit crimes, including assaults, robberies, extortion, and drug trafficking, to promote and further the activities of Playboys.

9.    Defendants EDUARDO LUNA, SANCHEZ, PONCE, LUIS LUNA, and EDWARDS, and others known and unknown to the Grand Jury, would commit and threaten acts of violence, including assaults, robberies, and extortion, against citizens of the community and rival gang members within Playboys' territory, to promote and further the activities of Playboys.

10.    Defendants ELISEO LUNA, M. ALONSO, PONCE, and LUIS LUNA, and others known and unknown to the Grand Jury, would possess, use, and carry, and direct others to possess, use, and carry firearms, in order to commit and threaten acts of violence, including murder and assault, to enforce the authority of Playboys.

11.    Defendants ELISEO LUNA, ROMAN, EDUARDO LUNA, SANCHEZ, M. ALONSO, PONCE, and LUIS LUNA, and others known and unknown to the Grand Jury, would possess and distribute controlled substances in the territory controlled by Playboys.

12.    Defendants ELISEO LUNA, ROMAN, EDUARDO LUNA, M. ALONSO, PONCE, LUIS LUNA, and EDWARDS, and others known and unknown to the

16

Grand Jury, would possess and distribute firearms in the territory controlled by Playboys.

C.   OVERT ACTS

13.   In furtherance of the conspiracy, and to accomplish the object of the conspiracy, on or about the following dates, defendants ELISEO LUNA, ROMAN, LINARES, EDUARDO LUNA, SANCHEZ, M. ALONSO, PONCE, LUIS LUNA, and EDWARDS, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:   On October 5, 2018, defendant PONCE sold approximately 12.96 grams of methamphetamine for $200 to a confidential informant ("CI-2") working with law enforcement.

Overt Act No. 2:   On November 15, 2018, by telephone using coded language, defendant SANCHEZ arranged to collect an extortion payment, and later collected a $250 extortion payment on behalf of Playboys from a confidential informant ("CI-1").

Overt Act No. 3:   On December 18, 2018, by telephone using coded language, defendant SANCHEZ arranged to collect and collected a $300 extortion payment on behalf of Playboys from CI-1.

Overt Act No. 4:   On January 15, 2019, by telephone using coded language, defendant SANCHEZ arranged to collect and collected a $300 extortion payment on behalf of Playboys from CI-1.

Overt Act No. 5:   On March 14, 2019, by telephone using coded language, defendant SANCHEZ arranged to collect and collected a $250 extortion payment on behalf of Playboys from CI-1.

Overt Act No. 6:   On July 15, 2019, by text message using coded language, defendant M. ALONSO quoted his drug pricing and

arranged to sell two ounces of methamphetamine to a confidential informant ("CI-3").

Overt Act No. 7:   On July 16, 2019, defendant M. ALONSO sold approximately 53.42 grams of methamphetamine to CI-3 for $340.

Overt Act No. 8:   On July 24, 2019, defendant M. ALONSO sold approximately 80.17 grams of methamphetamine to CI-3 for $500.

Overt Act No. 9:   On July 28, 2019, by text message using coded language, defendant M. ALONSO discussed selling multiple firearms to CI-3.

Overt Act No. 10:   On August 5, 2019, by telephone using coded language, defendant M. ALONSO discussed selling a firearm for $850 and two ounces of methamphetamine for an undisclosed price to CI-3.

Overt Act No. 11:   On August 7, 2019, defendant M. ALONSO sold approximately 56.66 grams of methamphetamine and a firearm to CI-3 for $1,190.

Overt Act No. 12:   On August 14, 2019, by telephone and text message using coded language, defendant M. ALONSO arranged to sell and sold approximately 27.77 grams of methamphetamine for $200 and a firearm for $700 to CI-3.

Overt Act No. 13:   On August 15, 2019, by telephone using coded language, defendant SANCHEZ arranged to collect and collected a $300 extortion payment on behalf of Playboys from CI-1.  Later that same day, defendant SANCHEZ offered to sell to CI-1 two ounces of methamphetamine for $350.

Overt Act No. 14:   On August 21, 2019, by telephone using coded language, defendant SANCHEZ arranged to sell and sold approximately 74.52 grams of methamphetamine to CI-1 for $500.

1    <u>Overt Act No. 15:</u>   On August 22, 2019, defendant M. ALONSO sold

2    an assault rifle to CI-3 for $1,350.

3    <u>Overt Act No. 16:</u>   On September 8, 2019, by telephone using

4    coded language, defendant SANCHEZ discussed with a confidential

5    informant ("CI-5") the extortion of a business in rival gang

6    territory on behalf of Playboys, and defendant SANCHEZ said he had

7    approval from the Mexican Mafia member in charge to tax the business.

8    <u>Overt Act No. 17:</u>   On September 16, 2019, by telephone using

9    coded language, defendant SANCHEZ arranged to collect and collected a

10   $300 extortion payment on behalf of Playboys from CI-1, and arranged

11   to sell and sold to CI-1 approximately 82.6 grams of methamphetamine

12   for $600.

13   <u>Overt Act No. 18:</u>   On September 18, 2019, defendant PONCE sold

14   approximately 6.29 grams of methamphetamine to CI-3 for $100.

15   <u>Overt Act No. 19:</u>   On September 26, 2019, by telephone using

16   coded language, Justin Gutierrez discussed selling methamphetamine to

17   a confidential informant ("CI-4").

18   <u>Overt Act No. 20:</u>   On October 3, 2019, defendant M. ALONSO sold

19   approximately 55.4 grams of methamphetamine to CI-3 for $300.

20   <u>Overt Act No. 21:</u>   On October 8, 2019, defendant M. ALONSO sold

21   two firearms to CI-3 for $1,800.

22   <u>Overt Act No. 22:</u>   On October 16, 2019, defendant SANCHEZ sold

23   approximately 54 grams of methamphetamine to CI-1 for $400 and

24   collected a $300 extortion payment.

25   <u>Overt Act No. 23:</u>   On October 22, 2019, defendant M. ALONSO

26   sold a firearm to CI-3 for $1,500.

27

28

1      Overt Act No. 24:   On November 13, 2019, by telephone using

2 coded language, defendant M. ALONSO told a customer that he was

3 expecting a half-pound of drugs.

4      Overt Act No. 25:   On November 14, 2019, by telephone using

5 coded language, defendant M. ALONSO arranged to sell one ounce of

6 methamphetamine to a customer.

7      Overt Act No. 26:   On November 14, 2019, defendant M. ALONSO

8 sold approximately 82.4 grams of methamphetamine to CI-3 for $455.

9      Overt Act No. 27:   On November 15, 2019, defendant SANCHEZ sold

10 approximately 55.1 grams of methamphetamine to CI-1 for $400 and

11 collected a $300 extortion payment from CI-1.

12      Overt Act No. 28:   On November 15, 2019, by telephone using

13 coded language, defendants EDWARDS and M. ALONSO discussed committing

14 burglaries or robberies in locations with a smaller law enforcement

15 presence.

16      Overt Act No. 29:   On November 16, 2019, by telephone using

17 coded language, defendants SANCHEZ and EDUARDO LUNA discussed the

18 extortion of multiple businesses and drug houses, and defendant

19 EDUARDO LUNA directed defendant SANCHEZ to collect money from

20 Playboys' 42nd Street clique.

21      Overt Act No. 30:   On November 16, 2019, by telephone,

22 defendant SANCHEZ and a co-conspirator discussed collecting extortion

23 payments, and defendant SANCHEZ directed the co-conspirator to inform

24 a business that defendant SANCHEZ would be collecting $350 this

25 month.

26      Overt Act No. 31:   On November 16, 2019, by telephone using

27 coded language, defendants M. ALONSO and EDWARDS discussed various

28 potential burglaries/robberies: at one location, defendants M. ALONSO

and EDWARDS discussed physically assaulting the resident if s/he was present during the robbery; at another location, defendants M. ALONSO and EDWARDS planned to steal cash, firearms, cocaine, crack cocaine, and marijuana that they knew was at the residence; defendants M. ALONSO and EDWARDS also discussed how to avoid recognition and detection by security cameras; and defendants M. ALONSO and EDWARDS also discussed where to dispose of their stolen drugs.

Overt Act No. 32:   On November 17, 2019, by telephone using coded language, defendant M. ALONSO arranged to sell a 9mm firearm to CI-3.

Overt Act No. 33:   On November 17, 2019, by telephone using coded language, defendants M. ALONSO and EDWARDS discussed a missed opportunity for a burglary/robbery from the previous day, and their intention to find another location to steal from that day.

Overt Act No. 34:   On November 18, 2019, by telephone using coded language, defendant M. ALONSO through a third party, sold approximately 54.4 grams of methamphetamine for $300 and the 9mm firearm for $800 to CI-3.

Overt Act No. 35:   On November 21, 2019, by telephone using coded language, defendants M. ALONSO and EDWARDS discussed a planned robbery/burglary the following day, as well as defendant M. ALONSO's desire to purchase an AR-style assault rifle for $800 from defendant EDWARDS's source.

Overt Act No. 36:   On November 22, 2019, by telephone using coded language, defendants M. ALONSO and EDWARDS further discussed purchasing an AR-style assault rifle that defendant M. ALONSO planned to provide to a customer, as well as multiple small handguns.

1     <u>Overt Act No. 37:</u>  On November 25, 2019, by telephone using

2 coded language, defendant M. ALONSO arranged to sell two ounces of

3 methamphetamine for $260 and a firearm for $800 to CI-3.

4     <u>Overt Act No. 38:</u>  On November 25, 2019, defendants LUIS LUNA

5 and EDUARDO LUNA sold approximately 75.1 grams of methamphetamine to

6 CI-3 for $587.

7     <u>Overt Act No. 39:</u>  On November 28, 2019, by telephone using

8 coded language, defendants M. ALONSO and EDWARDS discussed the need

9 to physically discipline another Playboys member, either by beating

10 or shooting the member, and agreed to speak with a member of the

11 Mexican Mafia about the matter.

12     <u>Overt Act No. 40:</u>  On November 28, 2019, by telephone using

13 coded language, defendant M. ALONSO arranged to sell two ounces of

14 drugs for $240 to an unknown customer.

15     <u>Overt Act No. 41:</u>  On November 29, 2019, by telephone using

16 coded language, defendants M. ALONSO and EDWARDS and a co-conspirator

17 discussed an issue with, and planned discipline of, another Playboys

18 member.  Later that day, by telephone using coded language, defendant

19 M. ALONSO and the co-conspirator arranged to meet.

20     <u>Overt Act No. 42:</u>  On November 29, 2019, by telephone using

21 coded language, defendant M. ALONSO and a co-conspirator discussed

22 defendant M. ALONSO's intent to obtain two ounces of methamphetamine

23 to sell for profit.

24     <u>Overt Act No. 43:</u>  On November 30, 2019, defendant M. ALONSO

25 sold approximately 52.5 grams of methamphetamine and a firearm to

26 CI-3 for a total of $1,060.

27     <u>Overt Act No. 44:</u>  On November 30, 2019, defendant LUIS LUNA

28 sold approximately 51.2 grams of methamphetamine to CI-3 for $400.

1      Overt Act No. 45:   On December 2, 2019, by telephone using
2  coded language, defendant SANCHEZ discussed extortion and gang
3  territory with an unknown victim.

4      Overt Act No. 46:   On December 3, 2019, by telephone using
5  coded language, defendant SANCHEZ discussed selling one ounce of
6  methamphetamine to an unidentified customer.

7      Overt Act No. 47:   On December 3, 2019, by telephone using
8  coded language, defendant M. ALONSO told a customer seeking to buy
9  methamphetamine that he had an ounce of methamphetamine available.

10      Overt Act No. 48:   On December 3, 2019, by telephone using
11  coded language, defendants SANCHEZ and EDUARDO LUNA discussed
12  tensions between Playboys and rival gang Florencia 13 ("F13"), where
13  defendant EDUARDO LUNA accused defendant SANCHEZ of failing to handle
14  the situation correctly, requiring defendant EDUARDO LUNA to get
15  personally involved.

16      Overt Act No. 49:   On December 5, 2019, by telephone using
17  coded language, defendant M. ALONSO and a co-conspirator discussed
18  selling a kilogram of cocaine for $25,000 to a customer, and
19  discussed the quality of the cocaine, which came from Mexico.

20      Overt Act No. 50:   On December 5, 2019, by telephone using
21  coded language, defendants SANCHEZ and ROMAN discussed the extortion
22  of multiple businesses in Playboys territory, attempted encroachment
23  by F13, and the collection of monthly taxes and drug proceeds from
24  Playboys members to be delivered to MM-1.  During the conversation,
25  defendant ROMAN directed defendant SANCHEZ to have defendant ELISEO
26  LUNA contact defendant ROMAN to discuss drug distribution activity in
27  a certain territory of Playboys.

28

<u>Overt Act No. 51:</u>   On December 12, 2019, by telephone using coded language, defendants SANCHEZ and ROMAN discussed extortion and drug selling operations on behalf of Playboys, and the monthly payment of proceeds to defendant ROMAN on behalf of the Mexican Mafia.   Defendants SANCHEZ and ROMAN also discussed conflicts between Playboys and F13 over gang territory in relation to collection of extortion payments.

<u>Overt Act No. 52:</u>   On December 16, 2019, by telephone using coded language, defendant M. ALONSO arranged to sell a firearm with a large capacity magazine to an unknown customer for $900.

<u>Overt Act No. 53:</u>   On December 16, 2019, by telephone using coded language, defendant M. ALONSO and a co-conspirator discussed selling a pound of drugs for $850, the sale of a Glock firearm for $850, the sale of another firearm for $800, and the sale of a drum magazine for a firearm for $125.

<u>Overt Act No. 54:</u>   On December 16, 2019, by telephone using coded language, defendant M. ALONSO and David Zambrano discussed sending drug customers to defendant M. ALONSO in exchange for Zambrano receiving a share of the proceeds; the purchase of an AR-style assault rifle for $500 from a third party; and the purchase of handguns by Zambrano from M. ALONSO.

<u>Overt Act No. 55:</u>   On December 17, 2019, by telephone using coded language, defendant SANCHEZ spoke to an extortion victim and requested payment of the monthly extortion fee.

<u>Overt Act No. 56:</u>   On December 19, 2019, by telephone using coded language, defendant LUIS LUNA arranged to sell methamphetamine and a firearm to CI-3.

<u>Overt Act No. 57:</u>   On December 21, 2019, defendant SANCHEZ sold approximately 81.2 grams of methamphetamine for $600 to CI-1 and collected $300 as an extortion payment.

<u>Overt Act No. 58:</u>   On December 21, 2019, by telephone using coded language, defendant M. ALONSO and a co-conspirator discussed the sale of one ounce of methamphetamine.

<u>Overt Act No. 59:</u>   On December 23, 2019, by text message using coded language, defendant SANCHEZ arranged to meet with an extortion victim to collect an extortion payment.

<u>Overt Act No. 60:</u>   On December 23, 2019, by telephone using coded language, defendant M. ALONSO inquired whether a co-conspirator could obtain magazines for AR-style assault rifles.

<u>Overt Act No. 61:</u>   On December 24, 2019, by telephone using coded language, defendant M. ALONSO agreed to deliver one ounce of drugs to a co-conspirator.

<u>Overt Act No. 62:</u>   On December 25, 2019, by telephone using coded language, defendant SANCHEZ discussed extortion payments with an unidentified victim.  During the call, defendant SANCHEZ explained that his territory included all of the San Fernando Valley, and the unidentified victim could not avoid paying extortion payments simply because s/he moved his/her business to a new location.

<u>Overt Act No. 63:</u>   On December 27, 2019, by telephone using coded language, defendant M. ALONSO and a co-conspirator discussed the weight of drugs that defendant M. ALONSO previously sold, and discussed acquiring an additional five to ten pounds of drugs for resale.

Overt Act No. 64:   On December 27, 2019, by telephone using coded language, defendant M. ALONSO inquired about an AR-style assault rifle that he was looking to acquire on behalf of his cousin.

Overt Act No. 65:   On December 27, 2019, by text message using coded language, defendant SANCHEZ arranged to meet with an extortion victim to collect an extortion payment.

Overt Act No. 66:   On December 28, 2019, defendant M. ALONSO sold a rifle and ammunition to CI-3 for $1,200.

Overt Act No. 67:   On December 28, 2019, defendant M. ALONSO, by telephone using coded language, instructed David Alonso ("D. Alonso") to prepare an "eight ball" from a stash of drugs in a safe for a customer waiting outside of D. Alonso's residence, and later received confirmation from D. Alonso that the customer received the drugs.

Overt Act No. 68:   On December 28, 2019, by telephone using coded language, defendant M. ALONSO and D. Alonso discussed that D. Alonso would dispose of the drugs in his pocket because there was a police helicopter in the area, and defendant M. ALONSO instructed D. Alonso to wrap up the drugs and hide them where they could be retrieved, and to hide the ammunition that was in the house.

Overt Act No. 69:   On December 28, 2019, by telephone using coded language, defendant M. ALONSO discussed with D. Alonso a customer going to D. Alonso's residence to purchase an ounce of drugs.  Later, D. Alonso agreed to prepare a half ounce of drugs for a customer who would pay $50 for the drugs, and when defendant M. ALONSO informed D. Alonso that the customer was outside, D. Alonso said the customer should meet him in the back.

Overt Act No. 70:   December 30, 2019, by telephone using coded language, defendant M. ALONSO and a co-conspirator discussed an AR-style assault rifle that defendant M. ALONSO was seeking to acquire on behalf of his cousin who had recently been shot at.

Overt Act No. 71:   On December 31, 2019, by telephone using coded language, defendant M. ALONSO and Gutierrez discussed selling 1,000 to 2,000 opioid pills for $2 per pill.

Overt Act No. 72:   On December 31, 2019, by telephone using coded language, defendant M. ALONSO asked D. Alonso to retrieve a firearm for defendant M. ALONSO.

Overt Act No. 73:   On January 1, 2020, by telephone using coded language, defendant M. ALONSO and a co-conspirator discussed defendant M. ALONSO purchasing a fully automatic 9mm caliber firearm for $800, and defendant M. ALONSO offered $600 for the firearm. Later, the co-conspirator said his source would not sell for that price, and offered a .380 caliber revolver, but defendant M. ALONSO said he wanted a firearm that held more ammunition.  Defendant M. ALONSO then offered $650 for the 9mm caliber firearm.

Overt Act No. 74:   On January 3, 2020, by telephone using coded language, defendant M. ALONSO and a co-conspirator discussed Playboys and Mexican Mafia politics, as well as firearms and drug trafficking on behalf of the gang.

Overt Act No. 75:   On January 3, 2020, by telephone using coded language, defendant M. ALONSO asked a co-conspirator to bring defendant M. ALONSO a firearm that was at least 9mm caliber, and the co-conspirator agreed to bring him a .45 caliber firearm.

Overt Act No. 76:   On January 3, 2020, by telephone using coded language, defendant M. ALONSO asked a co-conspirator to sell him

eight pounds of methamphetamine for $1,000 per pound, and the co-conspirator said he would inquire of his sources.

Overt Act No. 77:   On January 3, 2020, by telephone using coded language, defendant M. ALONSO discussed with D. Alonso selling drugs to a customer for $70.

Overt Act No. 78:   On January 4, 2020, by telephone using coded language, defendant M. ALONSO agreed to sell drugs to a customer and directed the customer to his home on 48th Street.

Overt Act No. 79:   On January 5, 2020 by telephone using coded language, defendants EDUARDO LUNA and SANCHEZ discussed defendant EDUARDO LUNA's physical assault of a Playboys member for disrespecting defendant EDUARDO LUNA.  Defendant EDUARDO LUNA directed defendant SANCHEZ to arrange for further discipline of the Playboys member on behalf of defendant EDUARDO LUNA.  Defendant SANCHEZ agreed to warn other Playboys members that they would be disciplined for disrespecting higher-ranking members.

Overt Act No. 80:   On January 9, 2020, by telephone using coded language, defendant M. ALONSO and Zambrano discussed the sale of methamphetamine for $110 per ounce and $400 per quarter pound, and the sale of heroin for $650 per ounce.

Overt Act No. 81:   On January 9, 2020, during multiple telephone calls using coded language, defendant M. ALONSO instructed D. Alonso to give a customer an ounce of methamphetamine, and D. Alonso agreed.  D. Alonso told defendant M. ALONSO that he (D. Alonso) had received $60 from the customer, that the police were following the customer, and that D. Alonso was going to hide the rest of the drugs in case the police came back to his residence.

1    Overt Act No. 82:   On January 9, 2020, by telephone using coded
2    language, a customer told defendant M. ALONSO that she had given $100
3    to D. Alonso in exchange for one ounce of methamphetamine.

4    Overt Act No. 83:   On January 9, 2020, defendant M. ALONSO and
5    D. Alonso sold approximately 21 grams of methamphetamine to a
6    customer.

7    Overt Act No. 84:   On January 11, 2020, by telephone using
8    coded language, defendant M. ALONSO told a customer that he would
9    sell a pound of methamphetamine for $1,200, and a quarter pound for
10   $450.

11   Overt Act No. 85:   On January 11, 2020, by telephone using
12   coded language, defendant SANCHEZ discussed collection of an
13   extortion payment with an unidentified victim.

14   Overt Act No. 86:   On January 17, 2020, defendant SANCHEZ
15   received a $350 extortion payment from CI-1.

16   Overt Act No. 87:   On January 21, 2020, a co-conspirator
17   brandished a firearm and robbed a victim at CI-1's business that was
18   being extorted by Playboys.

19   Overt Act No. 88:   On January 22, 2020, defendant SANCHEZ
20   returned certain items stolen by a co-conspirator and informed CI-1
21   that defendant ROMAN had authorized defendant SANCHEZ to discount the
22   monthly extortion payment by $100 due to the robbery.

23   Overt Act No. 89:   On January 29, 2020, defendant M. ALONSO
24   sold two firearms and ammunition to CI-3 for $1,800.

25   Overt Act No. 90:   On February 6, 2020, by telephone using
26   coded language, defendant ROMAN and a co-conspirator discussed the
27   sale of various quantities of heroin, including one ounce of heroin

28

for $750, and Playboys and Mexican Mafia politics, and defendant ROMAN's relationship with MM-1.

Overt Act No. 91:   On February 6, 2020, by telephone using coded language, defendant SANCHEZ and Kevin Butler discussed Butler's anticipated receipt of a delivery of drugs.

Overt Act No. 92:   On February 8, 2020, by telephone using coded language, defendant M. ALONSO and a firearms source discussed purchasing an automatic rifle for $900 to $950.

Overt Act No. 93:   On February 8, 2020, by telephone using coded language, defendant M. ALONSO contacted an unidentified drug source to inquire about the availability, quality, and price of available drugs.

Overt Act No. 94:   On February 8, 2020, by telephone using coded language, defendant ELISEO LUNA directed defendant SANCHEZ to locate a certain Playboys member for discipline, and defendant SANCHEZ agreed.

Overt Act No. 95:   On February 9, 2020, by telephone using coded language, defendants ELISEO LUNA and SANCHEZ discussed the attempts to locate the Playboys member whom defendant ELISEO LUNA wanted to discipline.  Defendant SANCHEZ asked defendant ELISEO LUNA if there was a reward for finding the Playboys member.  Defendant ELISEO LUNA directed defendant SANCHEZ to lure the Playboys member to a location for discipline.

Overt Act No. 96:   On February 9, 2020, by telephone using coded language, defendant SANCHEZ discussed the collection of a $150 extortion payment with an unidentified victim.

Overt Act No. 97:   On February 11, 2020, by telephone using coded language, a co-conspirator told defendant ROMAN that he had a

30

customer who wanted $500 worth of methamphetamine.  Defendant ROMAN agreed to provide six ounces for $500.

Overt Act No. 98:  On February 11, 2020, by telephone using coded language, defendants ELISEO LUNA and SANCHEZ discussed the upcoming discipline of the Playboys member.

Overt Act No. 99:  On February 11, 2020, by telephone using coded language, defendant M. ALONSO and Gutierrez discussed defendant ELISEO LUNA's instructions to physically discipline and assault another Playboys member.

Overt Act No. 100:  On February 11, 2020, by telephone using coded language, defendants ROMAN and SANCHEZ discussed selling methamphetamine to a drug customer.  Later that same day, by telephone using coded language, defendant ROMAN informed defendant SANCHEZ that she had spoken to her supplier and could obtain six units of methamphetamine for $650.

Overt Act No. 101:  On February 11, 2020, by telephone using coded language, defendant EDUARDO LUNA told defendant SANCHEZ that he had robbed a third party of marijuana.

Overt Act No. 102:  On February 12, 2020, by telephone using coded language, defendant SANCHEZ and Butler discussed the planned assault and discipline of a fellow Playboys member and defendant SANCHEZ's requirement that other Playboys members provide information about the intended victim or face discipline themselves, and Butler agreed to assist defendant SANCHEZ in locating the victim.

Overt Act No. 103:  On February 16, 2020, by telephone using coded language, defendants EDUARDO LUNA and SANCHEZ discussed collecting $500 in extortion payments from a business on 42nd Street, defendant EDUARDO LUNA said the business owner wanted defendant

EDUARDO LUNA to go with defendant SANCHEZ to collect the money, and defendant SANCHEZ agreed to accompany defendant EDUARDO LUNA to "shake them up."

Overt Act No. 104:  On February 17, 2020, defendant SANCHEZ collected a $175 extortion payment from CI-1.

Overt Act No. 105:  On February 19, 2020, by telephone using coded language, defendant M. ALONSO and Gutierrez discussed disciplining another Playboys member.

Overt Act No. 106:  On February 19, 2020, by telephone using coded language, defendant ROMAN and a co-conspirator discussed defendant ROMAN obtaining an ounce of drugs.

Overt Act No. 107:  On February 19, 2020, by telephone using coded language, defendant ROMAN and her supplier arranged for defendant ROMAN to purchase heroin; defendant ROMAN told the supplier that an associate needed a firearm; and the supplier agreed to try to find a firearm for defendant ROMAN's associate.

Overt Act No. 108:  On February 21, 2020, in a telephone conversation, defendants EDUARDO LUNA and SANCHEZ discussed collecting $500 in extortion payments from a business on Slauson Avenue and Avalon Boulevard, and defendant EDUARDO LUNA said that the business was "crossing the line" and that defendants EDUARDO LUNA and SANCHEZ needed to visit the business.

Overt Act No. 109:  On February 22, 2020, defendant ROMAN traveled to California State Prison, Corcoran, to meet with MM-1 to discuss Playboys business.

Overt Act No. 110:  On February 22, 2020, by telephone using coded language, defendants SANCHEZ and ROMAN discussed defendant ROMAN's meeting with MM-1, wherein defendant ROMAN and MM-1 discussed

the conflicts between Playboys and F13, MM-1's resulting conflict
with another Mexican Mafia member, and MM-1's instructions that
defendant ELISEO LUNA was not to do anything on MM-1's behalf;
defendant SANCHEZ stated he knew that defendant ROMAN acted on behalf
of MM-1; defendant ROMAN directed defendant SANCHEZ to avoid working
with defendant ELISEO LUNA and to only deal with defendant ROMAN; and
defendants ROMAN and SANCHEZ agreed that defendant ROMAN would
accompany defendant SANCHEZ on his monthly rounds to collect
extortion payments in order for defendant ROMAN to personally
instruct victims that they were not to make any extortion payments to
defendant ELISEO LUNA.

Overt Act No. 111:  On February 24, 2020, by telephone using
coded language, defendant ROMAN discussed selling four units of
heroin to a co-conspirator, and agreed to contact her supplier to
obtain the heroin.

Overt Act No. 112:  On February 25, 2020, by telephone using
coded language, defendant ROMAN asked defendant SANCHEZ to contact a
member of F13 to obtain the phone number of an incarcerated Mexican
Mafia member.

Overt Act No. 113:  On February 25, 2020, by telephone using
coded language, defendant ROMAN and a co-conspirator discussed the
co-conspirator supplying defendant ROMAN with drugs, and defendant
ROMAN supplying the co-conspirator with a .38 caliber pistol, and the
two arranged to meet later that day.

Overt Act No. 114:  On February 27, 2020, by telephone using
coded language, defendants ROMAN and SANCHEZ discussed defendant
ROMAN's request that defendant SANCHEZ obtain the phone number of an
incarcerated Mexican Mafia member in order for defendant ROMAN to

discuss with the incarcerated member issues involving defendant ELISEO LUNA.

Overt Act No. 115:  On February 27, 2020, by telephone using coded language, defendant M. ALONSO and Gutierrez discussed selling drugs to a third party and discussed obtaining a firearm from another third party.

Overt Act No. 116:  On March 1, 2020, by telephone using coded language, defendant M. ALONSO discussed with a co-conspirator defendant M. ALONSO's plan to murder a rival 41st Street Gang member.

Overt Act No. 117:  On March 13, 2020, by telephone using coded language, defendant ELISEO LUNA and Butler discussed the planned assault of a third party.

Overt Act No. 118:  On March 13, 2020, by telephone using coded language, defendant ELISEO LUNA and Butler discussed defendant LUIS LUNA's request for payment for selling drugs, and defendant LUIS LUNA's drug distribution activities on the one-way streets in Playboys territory.

Overt Act No. 119:  On March 14, 2020, by telephone using coded language, a co-conspirator, identifying himself as a Playboys member, told an unidentified victim that he would begin collecting $80 in monthly extortion payments from the victim on behalf of Playboys.

Overt Act No. 120:  On March 14, 2020, by telephone using coded language, defendant ELISEO LUNA and a co-conspirator, who was incarcerated at the time, discussed defendant ELISEO LUNA's ability to supply large quantities of marijuana, heroin, and methamphetamine to out-of-state purchasers.

Overt Act No. 121:  On March 16, 2020, by telephone using coded language, defendant ROMAN and a supplier discussed defendant ROMAN

buying a .38 caliber firearm from the supplier's contact for $350; defendant ROMAN and the supplier unsuccessfully attempted to call the contact to arrange the purchase; defendant ROMAN said she would call the third party again later; and later that day, by telephone and text message using coded language, defendant ROMAN contacted the third party and arranged to purchase the firearm.

Overt Act No. 122:  On March 17, 2020, by telephone using coded language, defendant ELISEO LUNA and two co-conspirators discussed meeting in person to discuss selling drugs to out-of-state buyers.

Overt Act No. 123:  On March 18, 2020, by telephone using coded language, defendant ELISEO LUNA and Butler discussed two firearms that they had at the 4607 dispensary.

Overt Act No. 124:  On March 21, 2020, by text message using coded language, defendant ROMAN and a supplier discussed changes in the composition of the heroin that defendant ROMAN had available.

Overt Act No. 125:  On March 21, 2020, defendant SANCHEZ collected a $300 extortion payment from CI-1.

Overt Act No. 126:  On defendant March 22, 2020, by telephone using coded language, defendant ELISEO LUNA and a customer discussed their plans to meet at a warehouse at the corner of Avalon Boulevard and Manchester Avenue in Los Angeles, California to conduct a drug deal.

Overt Act No. 127:  On March 23, 2020, by telephone using coded language, defendant ELISEO LUNA and a co-conspirator discussed a quantity of drugs that defendant ELISEO LUNA sold to a third party via the co-conspirator.

Overt Act No. 128:  On March 25, 2020, by telephone using coded language, defendants ELISEO LUNA and EDUARDO LUNA discussed defendant

35

1  LINARES' order to discipline a Playboys member for disrespecting the

2  gang.

3      Overt Act No. 129:  On March 25, 2020, by telephone using coded

4  language, defendant ELISEO LUNA and Jeremiah English discussed

5  obtaining a truck to steal a generator.

6      Overt Act No. 130:  On March 26, 2020, by telephone using coded

7  language, defendant ELISEO LUNA and a co-conspirator discussed

8  defendant ELISEO LUNA's supply of methamphetamine and the elevated

9  cost due to the scarcity of the drug.

10     Overt Act No. 131:  On March 26, 2020, defendants PONCE and LUIS

11 LUNA, English, and Dzhamil Khasilov committed a home invasion robbery

12 of a marijuana dealer at a residence in Woodland Hills, California.

13     Overt Act No. 132:  On March 26, 2020, by telephone using coded

14 language, English described to defendant ELISEO LUNA the details of

15 the home invasion robbery, including the restraint of the victim, the

16 theft of $40,000 to $50,000 in cash and approximately ten pounds of

17 marijuana, and the gun fight between the co-conspirators and the

18 victim.  Defendant ELISEO LUNA instructed English to hide the car

19 that the co-conspirators used in the robbery, and to send Khasilov to

20 the hospital to check on defendant LUIS LUNA, who had been shot in

21 the stomach by the robbery victim.

22     Overt Act No. 133:  On March 26, 2020, by telephone using coded

23 language, defendant ELISEO LUNA told Butler that defendant PONCE was

24 caught by law enforcement driving the car used during the home

25 invasion robbery.

26     Overt Act No. 134:  On March 26, 2020, defendant PONCE possessed

27 a firearm used to commit the home invasion robbery discussed above.

28

Overt Act No. 135:  On March 27, 2020, by telephone using coded language, defendant ELISEO LUNA and English discussed evidence found in the car stopped by law enforcement the day before, and the whereabouts of the cash stolen during the robbery.

Overt Act No. 136:  On March 27, 2020, by telephone using coded language, Butler told defendant ELISEO LUNA that defendant PONCE said he did not have the cash stolen during the home invasion robbery, and that one of the other participants must have kept the money.

Overt Act No. 137:  On March 27, 2020, by telephone using coded language, defendant ELISEO LUNA instructed Butler not to keep firearms at the 4607 dispensary, but to store them in the apartment next door, and Butler agreed.

Overt Act No. 138:  On March 28, 2020, by telephone using coded language, defendant ELISEO LUNA and a co-conspirator discussed defendant LUIS LUNA's gunshot injuries from the robbery.

Overt Act No. 139:  On March 28, 2020, by telephone using coded language, defendant ROMAN and a co-conspirator discussed the increased price of a drug that defendant ROMAN sought to purchase.

Overt Act No. 140:  On March 29, 2020, by telephone using coded language, defendant ELISEO LUNA instructed Butler to pack a backpack containing drugs from the 4607 dispensary to provide to Jose Alonso ("J. Alonso"), to rid the entire location of any drug evidence, and to keep one firearm with Butler inside the location and conceal three firearms in the apartment downstairs, and Butler agreed to keep a .45 caliber handgun in the apartment next door.

Overt Act No. 141:  On March 29, 2020, by telephone using coded language, defendants ELISEO LUNA and EDUARDO LUNA discussed having to pay taxes to Playboys leadership for one of their drug-dealing

37

locations, and whether they should close the location rather than continue paying taxes.

Overt Act No. 142:  On March 29, 2020, by telephone using coded language, defendant ELISEO LUNA instructed J. Alonso to keep a backpack to be obtained from Butler containing a large quantity of drugs belonging to defendant ELISEO LUNA at J. Alonso's residence. J. Alonso agreed.

Overt Act No. 143:  On March 31, 2020, by telephone using coded language, defendant ELISEO LUNA and a co-conspirator discussed a .50 caliber firearm that defendant ELISEO LUNA planned to purchase from the co-conspirator.

Overt Act No. 144:  On April 1, 2020, by telephone using coded language, defendant ELISEO LUNA told Butler that he was considering closing the 4607 dispensary and having Butler work at the Car Wash dispensary, and Butler responded that he would do whatever defendant ELISEO LUNA needed.

Overt Act No. 145:  On April 1, 2020, by text message using coded language, defendant ROMAN asked defendant SANCHEZ if he was going to pick up extortion payments from victims, and said she needed the proceeds.

Overt Act No. 146:  On April 3, 2020, by telephone using coded language, defendant ELISEO LUNA and Butler discussed the diminished supply of drugs due to COVID-19-related lockdowns and the limited amount of profit that defendant ELISEO LUNA was able to make from drug sales that day.

Overt Act No. 147:  On April 4, 2020, by text message using coded language, defendant ROMAN discussed with a supplier the quality

of drugs that the supplier had provided, and received from the supplier a photo of several large bricks of suspected cocaine.

Overt Act No. 148:  On April 4, 2020, by telephone using coded language, Butler asked defendant SANCHEZ where he could purchase a sawed-off shotgun for his house.

Overt Act No. 149:  On April 15, 2020, by telephone using coded language, defendant ELISEO LUNA directed J. Alonso to transport two pounds of methamphetamine from the backpack J. Alonso had obtained from Butler to the Car Wash dispensary, where defendant LUIS LUNA would pick up the drugs.  J. Alonso agreed.

Overt Act No. 150:  On April 15, 2020, by telephone using coded language, defendant ELISEO LUNA confirmed with Butler that there were two units of methamphetamine in the backpack that Butler had given to J. Alonso.

Overt Act No. 151:  On April 15, 2020, defendant ELISEO LUNA, Butler, and J. Alonso possessed approximately 859 grams of methamphetamine.

Overt Act No. 152:  On April 15, 2020, by telephone using coded language, defendant ELISEO LUNA instructed a co-conspirator to verify the types and quantity of drugs that remained in the hidden backpack at the residence the co-conspirator shared with J. Alonso, and the co-conspirator confirmed that the bag contained heroin, and that J. Alonso had taken two bags of methamphetamine and agreed to hide the remaining heroin under the house.

Overt Act No. 153:  On April 16, 2020, defendant ELISEO LUNA, Butler, and J. Alonso possessed five bricks of heroin, with a combined weight of approximately 3.3 kilograms.

1        <u>Overt Act No. 154:</u>  On April 16, 2020, by telephone using coded
2 language, defendant ELISEO LUNA and Butler discussed the arrest of
3 J. Alonso and the seizure of drugs from his car and house.

4        <u>Overt Act No. 155:</u>  On April 17, 2020, by telephone using coded
5 language, defendant ELISEO LUNA told Butler that he no longer wanted
6 to work with J. Alonso.

7        <u>Overt Act No. 156:</u>  On April 17, 2020, by telephone using coded
8 language, defendants ROMAN and SANCHEZ discussed defendant SANCHEZ's
9 collection of extortion payments on behalf of the gang.

10        <u>Overt Act No. 157:</u>  On April 18, 2020, by telephone using coded
11 language, a co-conspirator advised defendant ELISEO LUNA about the
12 whereabouts of a certain Playboys member, and defendant ELISEO LUNA
13 said his people were looking for that Playboys member and planned to
14 shoot him.

15        <u>Overt Act No. 158:</u>  On April 18, 2020, by telephone using coded
16 language, defendant LINARES and defendant ELISEO LUNA discussed the
17 need to discipline through physical assault a Playboys member who had
18 violated the rules of the gang; defendant LINARES said he had
19 dispatched multiple other Playboys members to locate the member who
20 had violated the rules in order to assault him; defendants LINARES
21 and ELISEO LUNA agreed that the beating needed to be sufficiently
22 severe to cause the member to change his ways; and defendants LINARES
23 and ELISEO LUNA discussed possible locations where the transgressor
24 could be found.

25        <u>Overt Act No. 159:</u>  On April 18, 2020, by telephone using coded
26 language, defendants LINARES and ELISEO LUNA discussed Playboys
27 politics and two members they believed to be cooperating with law
28 enforcement.

<u>Overt Act No. 160:</u>  On April 22, 2020, by telephone using coded language, defendant ELISEO LUNA and a co-conspirator discussed the planned assault of a Playboys member that had been ordered by Playboys leaders.

<u>Overt Act No. 161:</u>  On April 25, 2020, by telephone and text message using coded language, defendant ELISEO LUNA and a co-conspirator discussed the whereabouts of the Playboys member who was to be assaulted by the gang.

<u>Overt Act No. 162:</u>  On April 30, 2020, by telephone using coded language, defendant ELISEO LUNA told English that he needed the .22 caliber firearm that was in English's possession for defendant ELISEO LUNA's marijuana shop, and English agreed to provide the firearm.

<u>Overt Act No. 163:</u>  On May 1, 2020, by text message using coded language, defendant ROMAN asked defendant SANCHEZ about the status of defendant SANCHEZ's monthly collection of extortion payments.

<u>Overt Act No. 164:</u>  On May 2, 2020, by telephone using coded language, defendants ELISEO LUNA and SANCHEZ discussed paying the monthly extortion payments they had collected to defendant ROMAN.

<u>Overt Act No. 165:</u>  On May 2, 2020, by telephone using coded language, defendants ROMAN and SANCHEZ discussed SANCHEZ collecting monthly extortion payments from defendant EDUARDO LUNA.

<u>Overt Act No. 166:</u>  On May 20, 2020, by telephone using coded language, defendant LINARES and a co-conspirator discussed the price of methamphetamine, specifically how the COVID-19 pandemic had caused methamphetamine prices to increase, and that the co-conspirator had been purchasing methamphetamine for $1,600 per pound but the whole city was "dry."

Overt Act No. 167:  On May 24, 2020, by text message using coded language, defendant LINARES and a co-conspirator discussed the co-conspirator's plan to assault a rival gang member.

Overt Act No. 168:  On May 25, 2020, by telephone using coded language, Mario Esparza told defendant LINARES he would send him $200 at the beginning of the month to send to MM-1.

Overt Act No. 169:  On May 25 and 26, 2020, by text message using coded language, defendant LINARES directed Denise Elias to pay gang taxes by adding money to the account of an incarcerated gang member.

Overt Act No. 170:  On May 27, 2020, by telephone using coded language, Mario Esparza greeted defendant LINARES by telephone stating, "Eastside Rabbit gang, 56!"  Defendant LINARES and Esparza discussed Esparza's drug dealing in his territory and gang politics, and Esparza said that he would only take orders from incarcerated Playboys leaders defendant LINARES and MM-1.

Overt Act No. 171:  On May 30, 2020, by telephone using coded language, defendant LINARES and a co-conspirator discussed Playboys gang members' participation in looting and rioting following civil rights protests, and the co-conspirator told defendant LINARES to instruct the Playboys members to pay a portion of the proceeds to senior gang members from selling looted goods.

Overt Act No. 172:  On May 31, 2020, by telephone using coded language, defendant LINARES directed a co-conspirator to contact a drug supplier for methamphetamine, and the two discussed gang taxes owed by the co-conspirator to defendant LINARES.

Overt Act No. 173:  On June 2, 2020, defendant EDWARDS reported to defendant LINARES that a Playboys member had failed to defend

fellow Playboys members against an attack by rival gang members by running away instead of using a shared Playboys firearm, defendant LINARES instructed defendant EDWARDS to assault this Playboys member as discipline for violating gang rules, and defendant EDWARDS agreed.

Overt Act No. 174:  On June 3, 2020, defendants EDWARDS and LINARES discussed defendant EDWARDS's attempts to discipline two Playboys members, including stealing the shared Playboys firearm from the Playboys member who failed to use the firearm discussed the previous day.

Overt Act No. 175:  On June 3, 2020, by telephone using coded language, defendant LINARES and a co-conspirator discussed the need to discipline a Playboys member.

Overt Act No. 176:  On June 4, 2020, by telephone using coded language, defendant LINARES and a co-conspirator discussed the upcoming disciplinary assaults of two Playboys members on orders from the Mexican Mafia, which included giving one or two warnings before killing the victim if necessary.

Overt Act No. 177:  On June 5, 2020, by telephone using coded language, defendant LINARES agreed to vouch for a co-conspirator with a third party methamphetamine supplier.

Overt Act No. 178:  On June 7, 2020, by telephone using coded language, defendant LINARES and a co-conspirator discussed collecting money from Playboys gang members to contribute to incarcerated members, and defendant LINARES instructed the co-conspirator to contact defendants EDWARDS and M. ALONSO, and Gutierrez, and others to contribute money from their cliques.

1    Overt Act No. 179:  On June 7, 2020, by telephone using coded
2    language, defendant LINARES and Mario Esparza discussed Esparza's
3    drug dealing activities.

4    Overt Act No. 180:  On June 7 and 8, 2020, by telephone using
5    coded language, defendant LINARES informed a co-conspirator that a
6    Playboys member needed to be physically assaulted as gang discipline
7    due to his behavior on social media, which was in violation of
8    Playboys rules, and the co-conspirator agreed.

9    Overt Act No. 181:  On June 8, 2020, defendant EDWARDS and a co-
10   conspirator assaulted and disciplined two Playboys members as
11   directed by defendant LINARES.

12   Overt Act No. 182:  On June 8, 2020, by text message using coded
13   language, a co-conspirator informed defendant LINARES that the co-
14   conspirator and numerous other Playboys members had just assaulted
15   and disciplined the fellow Playboys member, and that defendant
16   LINARES should be receiving a video of the assault.

17   Overt Act No. 183:  On June 8, 2020, by telephone using coded
18   language, defendant LINARES and Mario Esparza discussed gang tax
19   money that Esparza planned to send to defendant LINARES.

20   Overt Act No. 184:  On June 8 and 10, 2020, by text message
21   using coded language, Elias sent defendant LINARES debit card numbers
22   for her payment of gang taxes, and defendant LINARES directed Elias
23   to add money to the account of an incarcerated gang member.

24   Overt Act No. 185:  On June 9, 2020, by text message using coded
25   language, defendant LINARES thanked a co-conspirator for his assaults
26   on the two Playboys members whom defendant LINARES ordered to have
27   disciplined.

28

44

1        <u>Overt Act No. 186:</u>  On June 10, 2020, by text message using

2   coded language, a co-conspirator informed defendant LINARES that he

3   would send $100 to defendant LINARES for the incarcerated Playboys

4   members, as a contribution to Playboys.

5        <u>Overt Act No. 187:</u>  On June 11, 2020, by text message using

6   coded language, defendant LINARES and Elias discussed a murder that

7   defendant LINARES stated he committed in prison on orders from the

8   Mexican Mafia, and a murder that Elias stated she committed.

9        <u>Overt Act No. 188:</u>  On June 13, 2020, by text message using

10  coded language, defendant LINARES directed Elias to add money to the

11  account of an incarcerated gang member.

12       <u>Overt Act No. 189:</u>  On June 13, 2020, by telephone using coded

13  language, defendant LINARES and Mario Esparza discussed gang tax

14  money that Esparza sent to defendant LINARES, and the two discussed

15  the prison murder of a Mexican Mafia member.

16       <u>Overt Act No. 190:</u>  On June 14, 2020, by telephone using coded

17  language, defendant LINARES and a co-conspirator discussed collecting

18  taxes from gang members selling drugs on the streets on behalf of

19  MM-1, and defendant LINARES explained that when he was on the street

20  he would send MM-1 $500 per ounce of heroin that defendant LINARES

21  sold.

22       <u>Overt Act No. 191:</u>  On June 15, 2020, by text message using

23  coded language, defendant LINARES directed Elias to send him money

24  via debit card.

25       <u>Overt Act No. 192:</u>  On June 15, 2020, by telephone using coded

26  language, defendants LINARES and ROMAN discussed the need to

27  physically discipline a Playboys member, and defendant LINARES told

28  defendant ROMAN that he had a squad on the street that would

physically assault anyone defendant LINARES directed them to
discipline.

Overt Act No. 193:  On June 16, 2020, by telephone using coded
language, defendant LINARES instructed a co-conspirator to physically
assault and discipline another co-conspirator for robbing a "casita"
(gambling house) that belonged to MM-1, and defendant LINARES
instructed the co-conspirator to video-record the assault so that
defendant LINARES could send the recording to MM-1 as proof of the
discipline.  Later in the call, defendant LINARES and the co-
conspirator discussed the power struggle between rival gangs for
control of territories in South Los Angeles as a result of the murder
of an incarcerated Mexican Mafia member.

Overt Act No. 194:  On June 17, 2020, by text message using
coded language, defendant LINARES directed Elias to send him money
via debit card.

Overt Act No. 195:  On July 4, 2020, defendant EDWARDS and a co-
conspirator robbed a food vendor by physically assaulting the victim
and telling him/her that the co-conspirator had a gun, and defendant
EDWARDS told the victim that s/he was not allowed to sell anything in
Playboys territory.

Overt Act No. 196:  On July 23, 2020, defendant ELISEO LUNA and
Butler possessed multiple firearms and ammunition, and approximately
250 pounds of marijuana at the 4607 dispensary in Playboys gang
territory.

Overt Act No. 197:  On July 23, 2020, defendant ELISEO LUNA
possessed multiple firearms and ammunition at his residence in
Playboys gang territory.

1    <u>Overt Act No. 198:</u>  On August 5, 2020, defendant SANCHEZ met
2    with CI-1 and collected a $350 extortion payment.

3    <u>Overt Act No. 199:</u>  On August 26, 2020, Zambrano possessed with
4    intent to distribute approximately 36.8 grams of methamphetamine.

5    <u>Overt Act No. 200:</u>  On September 1, 2020, defendant SANCHEZ met
6    with CI-1 and collected a $350 monthly extortion payment.  Defendant
7    SANCHEZ told CI-1 that he would be sending a co-conspirator to rob
8    any extortion target that planned to relocate outside of Playboys
9    gang territory, and offered CI-1 a $100 discount on the monthly
10   extortion payment if CI-1 informed defendant SANCHEZ of any such
11   extortion target that planned to leave Playboys gang territory.
12   Defendant SANCHEZ further explained that Playboys territory included
13   Washington Boulevard to Imperial Highway and Avalon Boulevard to
14   Western Avenue.

15   <u>Overt Act No. 201:</u>  Between January 20 and February 14, 2021,
16   via social media messenger using coded language, Elias arranged to
17   buy methamphetamine for $1,250 per pound from a co-conspirator.

18   <u>Overt Act No. 202:</u>  On February 8, 2021, via social media
19   messenger using coded language, Elias and a co-conspirator discussed
20   the sale of two firearms for $800 each.

21   <u>Overt Act No. 203:</u>  Between February 8 and March 29, 2021, via
22   social media messenger using coded language, Elias complained to
23   defendant LINARES about gang members attempting to tax her for
24   selling guns in Playboys' territory.  Defendant LINARES directed
25   Elias to speak to MM-1.  Defendant LINARES and Elias also discussed
26   paying taxes to incarcerated Playboys and Mexican Mafia members.

27   <u>Overt Act No. 204:</u>  On April 1, 2021, via social media messenger
28   using coded language, Elias and a co-conspirator discussed Elias

fearing discipline from the gang for invoking the name of MM-1 to avoid paying taxes for her sale of $2,500 worth of firearms.

Overt Act No. 205: On July 25, 2021, defendant M. ALONSO and a co-conspirator attempted to murder a Playboys member by stabbing him multiple times in the head and torso for betraying Playboys.

Overt Act No. 206: On August 4, 2021, Elias sold approximately 438 grams of methamphetamine to a confidential informant ("CI-6") for $1,300.

Overt Act No. 207: On August 11, 2021, Elias sold approximately 444 grams of methamphetamine to CI-6 for $1,300.

Overt Act No. 208: On September 30, 2021, Elias sold approximately 450 grams of methamphetamine to CI-6 for $1,300.

D.   SPECIAL SENTENCING ALLEGATIONS

14.   Beginning on a date unknown to the Grand Jury, and continuing to on or about the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendants ELISEO LUNA, ROMAN, LINARES, EDUARDO LUNA, SANCHEZ, M. ALONSO, PONCE, and LUIS LUNA conspired with each other and others known and unknown to the Grand Jury to knowingly and intentionally distribute and possess with intent to distribute:

a.   at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), (b)(1)(A)(viii); and

b.   at least one kilogram of a mixture and substance containing a detectable amount of heroin, a Schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), (b)(1)(A)(i).

48

COUNT TWO

[18 U.S.C. § 1951(a)]

[DEFENDANTS PONCE, LUIS LUNA, ENGLISH, and KHASILOV]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Victim E.C. ran an unlicensed marijuana distribution business from his residence in Woodland Hills, California.

2.   Victim E.C. bought and sold large quantities of marijuana from his Woodland Hills residence.

B.   OBJECT OF THE CONSPIRACY

Beginning on a date unknown, and continuing to on or about March 26, 2020, in Los Angeles County, within the Central District of California, defendants MARCO ANTONIO PONCE, also known as ("aka") "Largo," aka "Mario Antonio Ponce," LUIS ALBERTO LUNA, aka "Pulga," aka "Flea," JEREMIAH ENGLISH, aka "Jay," aka "J," and DZHAMIL KHASILOV, aka "Ponytail," conspired with others known and unknown to the Grand Jury to knowingly and intentionally interfere with commerce by robbery, in violation of Title 18, United States Code, Section 1951(a).

C.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
     ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1.   Defendants ENGLISH and KHASILOV would identify a marijuana distributor to be robbed.

2.   Defendant ENGLISH would recruit defendants PONCE and LUIS LUNA to assist with the robbery.

1     3.    Defendants ENGLISH, KHASILOV, PONCE, and LUIS LUNA would
2  travel to Victim E.C.'s residence to conduct the robbery.

3     4.    Defendants PONCE and LUIS LUNA would go inside Victim
4  E.C.'s residence to commit the armed robbery, physically assaulting
5  Victim E.C., brandishing and discharging firearms in the course of
6  the armed robbery, and stealing U.S. currency and bags containing
7  marijuana from Victim E.C.'s residence.

8  D.   OVERT ACTS

9     In furtherance of the conspiracy, and to accomplish the object
10  of the conspiracy, on or about the following dates, defendants PONCE,
11  LUIS LUNA, ENGLISH, and KHASILOV, and others known and unknown to the
12  Grand Jury, committed various overt acts within the Central District
13  of California, including the overt acts numbered 131-136, and 138, as
14  set forth in Count One of this Indictment, which are incorporated
15  here, on or about the dates specified therein.

COUNT THREE

[18 U.S.C. §§ 1951(a), 2(a)]

[DEFENDANTS PONCE, LUIS LUNA, ENGLISH, AND KHASILOV]

On or about March 26, 2020, in Los Angeles County, within the Central District of California, defendants MARCO ANTONIO PONCE, also known as ("aka") "Largo," aka "Mario Antonio Ponce," LUIS ALBERTO LUNA, aka "Pulga," aka "Flea," JEREMIAH ENGLISH, aka "Jay," aka "J," and DZHAMIL KHASILOV, aka "Ponytail," and others known and unknown to the Grand Jury, each aiding and abetting the other, obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce by knowingly and willingly committing robbery, in that defendants PONCE, LUIS LUNA, ENGLISH, and KHASILOV, and others known and unknown to the Grand Jury, unlawfully took and obtained property, consisting of marijuana and drug proceeds, from the person and in the presence of victim E.C., against E.C.'s will, by means of actual and threatened force, violence, and fear of injury, immediate and future, to E.C.'s person.

COUNT FOUR

[18 U.S.C. § 3]

[DEFENDANT ELISEO LUNA]

On or about March 26, 2020, in Los Angeles County, within the Central District of California, Marco Ponce, also known as ("aka") "Largo," aka "Mario Antonio Ponce" ("Ponce"), Luis Alberto Luna, aka "Pulga," aka "Flea" ("Luis Luna"), Jeremiah English, aka "Jay," aka "J" ("English"), and Dzhamil Khasilov, aka "Ponytail" ("Khasilov"), and others known and unknown to the Grand Jury, each aiding and abetting the other, obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce by knowingly and willingly robbing E.C., and conspiring to do so, in that Ponce, Luis Luna, English, and Khasilov, and others known and unknown to the Grand Jury, unlawfully took and obtained property, consisting of marijuana and drug proceeds, from the person and in the presence of victim E.C., against E.C.'s will, by means of actual and threatened force, violence, and fear of injury, immediate and future, to E.C.'s person, in violation of Title 18, United States Code, Sections 1951(a), 2(a), as charged in Counts Two and Three of this Indictment.

Beginning on or about March 26, 2020, and continuing through on or about March 28, 2020, in Los Angeles County, within the Central District of California, knowing that an offense against the United States had been committed, to wit, the above-described Interference with Commerce by Robbery, in violation of Title 18, United States Code, Sections 1951(a), 2(a), defendant ELISEO LUNA, aka "Chilo," aka "Crazy," aka "Toca," aka "El Abogado," aka "Roberto Acosta," received, relieved, comforted, and assisted the offenders, Ponce,

Luis Luna, English, and Khasilov, in order to hinder and prevent the offenders' apprehension, trial and punishment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT FIVE

[21 U.S.C. § 846]

[DEFENDANTS ELISEO LUNA, ROMAN, LINARES, EDUARDO LUNA, SANCHEZ, M. ALONSO, ESPARZA, PONCE, LUIS LUNA, BUTLER, ELIAS, J. ALONSO, D. ALONSO, GUTIERREZ, AND ZAMBRANO]

Paragraphs 1 through 18 of the General Allegations of this Indictment are re-alleged and incorporated here.

A.   OBJECTS OF THE CONSPIRACY

Beginning on a date unknown, but no later than October 5, 2018, and continuing to the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendants ELISEO LUNA, also known as ("aka") "Chilo," aka "Crazy," aka "Toca," aka "El Abogado," aka "Roberto Acosta" ("ELISEO LUNA"), DIONICIA ROMAN, aka "D," aka "Dee," aka "Coco" ("ROMAN"), JORGE LINARES, aka "Goofy" ("LINARES"), EDUARDO LUNA, aka "Flaco," aka "Cesar Lopez" ("EDUARDO LUNA"), RENE LUNA SANCHEZ, aka "Seis," aka "6," aka "Huero," aka "Guero," aka "Bon Bon" ("SANCHEZ"), MOISES ALONSO, aka "Raskal" ("M. ALONSO"), MARIO ESPARZA, aka "Bullet" ("ESPARZA"), MARCO ANTONIO PONCE, aka "Largo," aka "Mario Antonio Ponce" ("PONCE"), LUIS ALBERTO LUNA, aka "Pulga," aka "Flea" ("LUIS LUNA"), KEVIN BUTLER, aka "Whiteboy" ("BUTLER"), DENISE ELIAS, aka "Innocent," aka "Hennessy" ("ELIAS"), JOSE ALONSO, aka "Gordo" ("J. ALONSO"), DAVID ALONSO, aka "Big Raskal" ("D. ALONSO"), JUSTIN GUTIERREZ, aka "Active" ("GUTIERREZ"), and DAVID ZAMBRANO ("ZAMBRANO"), and others known and unknown to the Grand Jury, conspired with each other to knowingly and intentionally distribute and possess with intent to distribute:

54

1          (a)   At least 50 grams of methamphetamine, a Schedule II
2    controlled substance, in violation of Title 21, United States Code,
3    Sections 841(a)(1), (b)(1)(A)(viii);
4          (b)   At least one kilogram of a mixture and substance
5    containing a detectable amount of heroin, a Schedule I narcotic drug
6    controlled substance, in violation of Title 21, United States Code,
7    Sections 841(a)(1), (b)(1)(A)(i);
8          (c)   At least 500 grams of a mixture or substance
9    containing a detectable amount of cocaine, a Schedule II narcotic
10   drug controlled substance, in violation of Title 21, United States
11   Code, Sections 841(a)(1), (b)(1)(B)(ii);
12         (d)   At least five grams of methamphetamine, a Schedule II
13   controlled substance, in violation of Title 21, United States Code,
14   Sections 841(a)(1), (b)(1)(B)(viii); and
15         (e)   Marijuana, a Schedule I narcotic drug controlled
16   substance, in violation of Title 21, United States Code, Sections
17   841(a)(1), (b)(1)(D).
18   B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
19        ACCOMPLISHED
20        The objects of the conspiracy were to be accomplished, in
21   substance, as follows:
22        1.   Defendants ELISEO LUNA, ROMAN, M. ALONSO, ESPARZA, and
23   others known and unknown to the Grand Jury, would provide, and assist
24   Playboys members and associates in obtaining, controlled substances
25   for further distribution within Playboys' territory.
26        2.   Defendant LINARES would direct the activities of Playboys
27   members and associates from jail, collect taxes from various Playboys
28   members and associates from drug trafficking activity, order physical

discipline of Playboys members who violated Playboys or Mexican Mafia rules or failed to pay taxes from drug proceeds, and order assaults of non-Playboys members and associates who sold drugs in Playboys territory.

3.   Defendants ELISEO LUNA and M. ALONSO, and others known and unknown to the Grand Jury, would act as shot callers of Playboys' cliques, with responsibility over their respective clique's activities including drug trafficking, tax collection, and control over territory.

4.   Defendants ELISEO LUNA, ROMAN, M. ALONSO, ESPARZA, PONCE, LUIS LUNA, and BUTLER, and others known and unknown to the Grand Jury, would obtain and possess firearms to protect their drug supply and enforce their drug territory.

5.   Defendants ROMAN, SANCHEZ, M. ALONSO, ESPARZA, ELIAS, J. ALONSO, D. ALONSO, GUTIERREZ, and ZAMBRANO, and others known and unknown to the Grand Jury, would possess with intent to distribute, distribute, and facilitate the distribution of controlled substances to individual customers in pre-arranged transactions.

6.   Defendants EDUARDO LUNA, ESPARZA, PONCE, and LUIS LUNA, and others known and unknown to the Grand Jury, would distribute controlled substances on the streets in Playboys' territory.

C.   OVERT ACTS

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, defendants ELISEO LUNA, ROMAN, LINARES, EDUARDO LUNA, SANCHEZ, M. ALONSO, ESPARZA, PONCE, LUIS LUNA, BUTLER, ELIAS, J. ALONSO, D. ALONSO, GUTIERREZ, and ZAMBRANO, and others known and unknown to the Grand Jury, committed various overt acts, within the Central District of California, and elsewhere, including the overt

acts numbered 1 through 208, as set forth in Count One of this Indictment, which are incorporated here, on or about the dates specified therein.

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

[DEFENDANT PONCE]

On or about October 5, 2018, in Los Angeles County, within the Central District of California, defendant MARCO ANTONIO PONCE, also known as ("aka") "Largo," aka "Mario Antonio Ponce," knowingly and intentionally distributed at least five grams, that is, approximately 12.96 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT M. ALONSO]

On or about July 16, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.42 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT M. ALONSO]

On or about July 24, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly and intentionally distributed at least 50 grams, that is, approximately 80.17 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT M. ALONSO]

On or about August 7, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly and intentionally distributed at least 50 grams, that is, approximately 56.66 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

[DEFENDANT M. ALONSO]

On or about August 14, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly and intentionally distributed at least five grams, that is, approximately 27.77 grams, of methamphetamine, a Schedule II controlled substance.

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SANCHEZ]

On or about August 21, 2019, in Los Angeles County, within the Central District of California, defendant RENE LUNA SANCHEZ, also known as ("aka") "Seis," aka "6," aka "Huero," aka "Guero," aka "Bon Bon," knowingly and intentionally distributed at least 50 grams, that is, approximately 74.52 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SANCHEZ]

On or about September 16, 2019, in Los Angeles County, within the Central District of California, defendant RENE LUNA SANCHEZ, also known as ("aka") "Seis," aka "6," aka "Huero," aka "Guero," aka "Bon Bon," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

[DEFENDANT PONCE]

On or about September 18, 2019, in Los Angeles County, within the Central District of California, defendant MARCO ANTONIO PONCE, also known as ("aka") "Largo," aka "Mario Antonio Ponce," knowingly and intentionally distributed at least five grams, that is, approximately 6.29 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT M. ALONSO]

On or about October 3, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SANCHEZ]

On or about October 16, 2019, in Los Angeles County, within the Central District of California, defendant RENE LUNA SANCHEZ, also known as ("aka") "Seis," aka "6," aka "Huero," aka "Guero," aka "Bon Bon," knowingly and intentionally distributed at least 50 grams, that is, approximately 54 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT M. ALONSO]

On or about November 14, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SANCHEZ]

On or about November 15, 2019, in Los Angeles County, within the Central District of California, defendant RENE LUNA SANCHEZ, also known as ("aka") "Seis," aka "6," aka "Huero," aka "Guero," aka "Bon Bon," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.1 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT M. ALONSO]

On or about November 18, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly and intentionally distributed at least 50 grams, that is, approximately 54.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS EDUARDO LUNA AND LUIS LUNA]

On or about November 25, 2019, in Los Angeles County, within the Central District of California, defendants EDUARDO LUNA, also known as ("aka") "Flaco," aka "Cesar Lopez," and LUIS ALBERTO LUNA, aka "Pulga," aka "Flea," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 75.1 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

[DEFENDANT LUIS LUNA]

On or about November 30, 2019, in Los Angeles County, within the Central District of California, defendant LUIS ALBERTO LUNA, also known as ("aka") "Pulga," aka "Flea," knowingly and intentionally distributed at least five grams, that is, approximately 51.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

[DEFENDANT M. ALONSO]

On or about November 30, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly and intentionally distributed at least five grams, that is, approximately 52.5 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SANCHEZ]

On or about December 21, 2019, in Los Angeles County, within the Central District of California, defendant RENE LUNA SANCHEZ, also known as ("aka") "Seis," aka "6," aka "Huero," aka "Guero," aka "Bon Bon," knowingly and intentionally distributed at least 50 grams, that is, approximately 81.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS M. ALONSO AND D. ALONSO]

On or about January 9, 2020, in Los Angeles County, within the Central District of California, defendants MOISES ALONSO, also known as ("aka") "Raskal," and DAVID ALONSO, aka "Big Raskal," each aiding and abetting the other, knowingly and intentionally distributed at least five grams, that is, approximately 21 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS ELISEO LUNA, BUTLER, AND J. ALONSO]

On or about April 15, 2020, in Los Angeles County, within the Central District of California, defendants ELISEO LUNA, also known as ("aka") "Chilo," aka "Crazy," aka "Toca," aka "El Abogado," aka "Roberto Acosta," KEVIN BUTLER, aka "Whiteboy," and JOSE ALONSO, aka "Gordo," each aiding and abetting the other, knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 859 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i); 18 U.S.C. § 2(a)]

[DEFENDANTS ELISEO LUNA, BUTLER, AND J. ALONSO]

On or about April 16, 2020, in Los Angeles County, within the Central District of California, defendants ELISEO LUNA, also known as ("aka") "Chilo," aka "Crazy," aka "Toca," aka "El Abogado," aka "Roberto Acosta," KEVIN BUTLER, aka "Whiteboy," and JOSE ALONSO, aka "Gordo," each aiding and abetting the other, knowingly and intentionally possessed with intent to distribute at least one kilogram, that is, approximately 3.3 kilograms, of a mixture and substance containing a detectable amount of heroin, a Schedule I narcotic drug controlled substance.

COUNT TWENTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

[DEFENDANT ZAMBRANO]

On or about August 26, 2020, in Los Angeles County, within the Central District of California, defendant DAVID ZAMBRANO knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 36.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ELIAS]

On or about August 4, 2021, in Los Angeles County, within the Central District of California, defendant DENISE ELIAS, also known as ("aka") "Innocent," aka "Hennessy," knowingly and intentionally distributed at least 50 grams, that is, approximately 438 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ELIAS]

On or about August 11, 2021, in Los Angeles County, within the Central District of California, defendant DENISE ELIAS, also known as ("aka") "Innocent," aka "Hennessy," knowingly and intentionally distributed at least 50 grams, that is, approximately 444 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ELIAS]

On or about September 30, 2021, in Los Angeles County, within the Central District of California, defendant DENISE ELIAS, also known as ("aka") "Innocent," aka "Hennessy," knowingly and intentionally distributed at least 50 grams, that is, approximately 450 grams, of methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THIRTY

[18 U.S.C. §§ 924(c)(1)(A)(ii), (iii), 924(c)(1)(C)(i), 2(a)]

[DEFENDANTS PONCE, LUIS LUNA, ENGLISH, AND KHASILOV]

On or about March 26, 2020, in Los Angeles County, within the Central District of California, defendants MARCO ANTONIO PONCE, also known as ("aka") "Largo," aka "Mario Antonio Ponce," LUIS ALBERTO LUNA, aka "Pulga," aka "Flea," JEREMIAH ENGLISH, aka "Jay," aka "J," and DZHAMIL KHASILOV, aka "Ponytail," and others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly used and carried firearms, namely, a Taurus, model PT111G2A, 9mm caliber pistol, bearing serial number TLW14982 (the "Taurus pistol") and an unidentified .380 caliber handgun (the ".380 caliber handgun"), and possessed such firearms in furtherance of, a crime of violence, namely, Interference With Commerce by Robbery, in violation of Title 18, United States Code, Section 1951(a), as charged in Count Three of this Indictment, and a drug trafficking crime, namely, Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846, as charged in Count Five of this Indictment, and, in so doing, brandished the Taurus pistol and the .380 caliber handgun, and discharged the .380 caliber handgun.

Defendant PONCE's possession of such firearms in furtherance of a crime of violence and drug trafficking crime occurred after defendant PONCE had previously been convicted of possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c), in the United States District Court for the Central District of California, case number

01-CR-00733-RSWL, which conviction became final on or about June 20, 2002.

COUNT THIRTY-ONE

[18 U.S.C. § 3]

[DEFENDANT ELISEO LUNA]

On or about March 26, 2020, in Los Angeles County, within the Central District of California, Marco Ponce, also known as ("aka") "Largo," aka "Mario Antonio Ponce" ("Ponce"), Luis Alberto Luna, aka "Pulga," aka "Flea" ("Luis Luna"), Jeremiah English, aka "Jay," aka "J" ("English"), and Dzhamil Khasilov, aka "Ponytail" ("Khasilov"), and others known and unknown to the Grand Jury, each aiding and abetting the other, used, carried, brandished, and discharged firearms during and in relation to, and possessed firearms in furtherance of, a crime of violence and drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A), (c)(1)(C), as charged in Count Thirty of this Indictment.

On or about March 26, 2020, in Los Angeles County, within the Central District of California, knowing that an offense against the United States had been committed, to wit, the above-described use, carrying, brandishing, and discharging of firearms during and in relation to, and possession of firearms in furtherance of a crime of violence, namely, Interference with Commerce by Robbery, in violation of Title 18, United States Code, Section 1951(a), and a drug trafficking crime, namely, Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846, all in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii), (iii), (c)(1)(C)(i), defendant ELISEO LUNA, aka "Chilo," aka "Crazy," aka "Toca," aka "El Abogado," aka "Roberto Acosta" received, relieved, comforted, and assisted the offenders, Ponce, Luis Luna, English, and

Khasilov, in order to hinder and prevent the offenders' apprehension, trial, and punishment.

COUNT THIRTY-TWO

[18 U.S.C. §§ 924(c)(1)(A)(i), 2(a)]

[DEFENDANTS ELISEO LUNA AND BUTLER]

On or about July 23, 2020, in Los Angeles County, within the Central District of California, defendants ELISEO LUNA, also known as ("aka") "Chilo," aka "Crazy," aka "Toca," aka "El Abogado," aka "Roberto Acosta," and KEVIN BUTLER, aka "Whiteboy," each aiding and abetting the other, knowingly possessed the following firearms in furtherance of drug trafficking crimes, namely, Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846, as charged in Count Five of this Indictment, and Possession With Intent to Distribute Marijuana, in violation of Title 21, United States Code, Section 841(a)(1):

1.   A Colt, model 1911, .45 caliber semi-automatic pistol, bearing an obliterated serial number;

2.   An Intratec, model Tec-DC9, 9mm Luger caliber semi-automatic pistol, bearing serial number D000735;

3.   An H&R, model 732, .32 caliber revolver, bearing serial number AE59907; and

4.   A CZ, model 52, 7.62x25mm caliber pistol, bearing serial number Z10571.

COUNT THIRTY-THREE

[18 U.S.C. § 922(g)(1)]

[DEFENDANT M. ALONSO]

On or about August 7, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly possessed a firearm, namely, a Smith & Wesson 9mm caliber pistol, bearing serial number FWU5380, in and affecting interstate and foreign commerce.

Defendant M. ALONSO possessed such firearm knowing that he had previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, case number BA432812, on or about January 26, 2015.

COUNT THIRTY-FOUR

[18 U.S.C. § 922(g)(1)]

[DEFENDANT M. ALONSO]

On or about August 14, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly possessed a firearm, namely, a Glock, model G27, .40 caliber pistol, bearing serial number EUK584US, in and affecting interstate and foreign commerce.

Defendant M. ALONSO possessed such firearm knowing that he had previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, case number BA432812, on or about January 26, 2015.

COUNT THIRTY-FIVE

[18 U.S.C. § 922(g)(1)]

[DEFENDANT M. ALONSO]

On or about August 22, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly possessed a firearm, namely, a Smith & Wesson, model M&P15, 5.56 NATO caliber rifle, bearing serial number SP42781, in and affecting interstate and foreign commerce.

Defendant M. ALONSO possessed such firearm knowing that he had previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, case number BA432812, on or about January 26, 2015.

COUNT THIRTY-SIX

[18 U.S.C. § 922(g)(1)]

[DEFENDANT M. ALONSO]

On or about October 8, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly possessed the following firearms and ammunition, in and affecting interstate and foreign commerce:

1.   A Roggio Arsenal, model RA-15, multi-caliber AR-style rifle, bearing serial number RA09022618;

2.   A Crucelegui Hermanos, .32 Long caliber revolver, bearing serial number 4191;

3.   44 rounds of Fiocchi .32 S&W long caliber ammunition;

4.   46 rounds of Prvi Partizan.32 S&W long ammunition;

5.   One round of Remington .223 caliber ammunition; and

6.   Four rounds of Sellier and Bellot .223 caliber ammunition.

Defendant M. ALONSO possessed such firearms and ammunition knowing that he had previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, case number BA432812, on or about January 26, 2015.

COUNT THIRTY-SEVEN

[18 U.S.C. § 922(g)(1)]

[DEFENDANT M. ALONSO]

On or about October 22, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly possessed a firearm, namely, a DPMS Panther Arms, model LR308, .308 caliber semi-automatic rifle, bearing serial number 139662, in and affecting interstate and foreign commerce.

Defendant M. ALONSO possessed such firearm knowing that he had previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, case number BA432812, on or about January 26, 2015.

COUNT THIRTY-EIGHT

[18 U.S.C. § 922(g)(1)]

[DEFENDANT M. ALONSO]

On or about November 18, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly possessed a firearm, namely, an SCCY Industries, model CPX-2, 9mm caliber pistol, bearing serial number 771840, in and affecting interstate and foreign commerce.

Defendant M. ALONSO possessed such firearm knowing that he had previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, case number BA432812, on or about January 26, 2015.

COUNT THIRTY-NINE

[18 U.S.C. § 922(g)(1)]

[DEFENDANT M. ALONSO]

On or about November 30, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly possessed the following ammunition, loaded in a 9mm firearm with no manufacturer's markings or serial number (commonly referred to as a "ghost gun"), in and affecting interstate and foreign commerce:

1. Five rounds of Remington 9mm caliber ammunition; and

2. Three rounds of Speer 9mm caliber ammunition.

Defendant M. ALONSO possessed such ammunition knowing that he had previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, case number BA432812, on or about January 26, 2015.

COUNT FORTY

[18 U.S.C. § 922(g)(1)]

[DEFENDANT M. ALONSO]

On or about December 28, 2019, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly possessed the following firearm and ammunition, in and affecting interstate and foreign commerce:

1.    An Areo Precision, model X15, multi-caliber, AR-style semi-automatic rifle, bearing serial number AR14563; and

2.    19 rounds of Winchester .223 Remington caliber ammunition.

Defendant M. ALONSO possessed such firearm and ammunition knowing that he had previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, case number BA432812, on or about January 26, 2015.

COUNT FORTY-ONE

[18 U.S.C. § 922(g)(1)]

[DEFENDANT M. ALONSO]

On or about January 29, 2020, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," knowingly possessed the following firearms, in and affecting interstate and foreign commerce:

1.   A Rock Island Armory, model 206, .38 Special caliber revolver, bearing serial number RIA2038020; and

2.   A Taurus, model PT809, 9mm caliber semi-automatic pistol, bearing serial number TKM60273.

Defendant M. ALONSO possessed such firearms knowing that he had previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, case number BA432812, on or about January 26, 2015.

1           COUNT FORTY-TWO

2           [18 U.S.C. § 922(g)(1)]

3           [DEFENDANT PONCE]

4      On or about March 26, 2020, in Los Angeles County, within the

5 Central District of California, defendant MARCO ANTONIO PONCE, also

6 known as ("aka") "Largo," aka "Mario Antonio Ponce," knowingly

7 possessed a firearm, namely, a Taurus, model PT111G2A, 9mm caliber

8 pistol, bearing serial number TLW14982, in and affecting interstate

9 and foreign commerce.

10     Defendant PONCE possessed such firearm knowing that he had

11 previously been convicted of at least one of the following felony

12 crimes, each punishable by a term of imprisonment exceeding one year:

13     1.   Vehicle Theft, in violation of California Vehicle Code

14 Section 10851, in the Superior Court for the State of California,

15 County of Los Angeles, case number BA470014, on or about July 31,

16 2018;

17     2.   Conspiracy to Possess with Intent to Distribute and to

18 Distribute Cocaine, in violation of Title 21, United States Code,

19 Section 846, in the United States District Court for the Central

20 District of California, case number CR 01-00733-RSWL, on or about

21 July 2, 2002;

22     3.   Possession of a Firearm in Furtherance of a Drug

23 Trafficking Crime, in violation of Title 18, United States Code,

24 Section 924(c), in the United States District Court for the Central

25 District of California, case number CR 01-00733-RSWL, on or about

26 July 2, 2002; and

27     4.   Possession of Controlled Substances, in violation of

28 California Health & Safety Code Section 11350(a), in the Superior

96

1   Court for the State of California, case number GA031390, on or about

2   October 9, 1997.

1

COUNT FORTY-THREE

2

[18 U.S.C. § 922(g)(1)]

3

[DEFENDANT ELISEO LUNA]

4    On or about July 23, 2020, in Los Angeles County, within the

5   Central District of California, defendant ELISEO LUNA, also known as

6   ("aka") "Chilo," aka "Crazy," aka "Toca," aka "El Abogado," aka

7   "Roberto Acosta," knowingly possessed the following firearms, in and

8   affecting interstate and foreign commerce:

9        1.    A Colt, model 1911, .45 caliber semi-automatic pistol,

10             bearing an obliterated serial number;

11       2.    An Intratec, model Tec-DC9, 9mm caliber semi-automatic

12             pistol, bearing serial number D000735;

13       3.    An H&R, model 732, .32 caliber revolver, bearing serial

14             number AE59907; and

15       4.    A CZ, model 52, 7.62x25mm caliber pistol, bearing serial

16             number Z10571.

17   Defendant ELISEO LUNA possessed such firearms knowing that he

18   had previously been convicted of at least one of the following felony

19   crimes, each punishable by a term of imprisonment exceeding one year:

20       1.    Possession of Methamphetamine for Sale, in violation of

21   California Health and Safety Code Section 11378, in the Superior

22   Court for the State of California, County of Los Angeles, case number

23   BA395499, on or about June 21, 2012; and

24       2.    Sale of a Controlled Substance, in violation of California

25   Health and Safety Code Section 11352, in the Superior Court for the

26   State of California, County of Los Angeles, case number BA289503, on

27   or about March 30, 2006.

28

COUNT FORTY-FOUR

[18 U.S.C. § 922(a)(1)(A)]

[DEFENDANT M. ALONSO]

Between on or about August 7, 2019 and on or about January 29, 2020, in Los Angeles County, within the Central District of California, defendant MOISES ALONSO, also known as "Raskal," not being licensed as an importer, manufacturer, or dealer of firearms, willfully engaged in the business of dealing in firearms, specifically, the sales of the following firearms on or about the following dates:

| DATE | FIREARM(S) |
| --- | --- |
| August 7, 2019 | A Smith & Wesson, 9mm caliber pistol, bearing serial number FWU5380 |
| August 14, 2019 | A Glock, model G27, .40 caliber pistol, bearing serial number EUK584US |
| August 22, 2019 | A Smith & Wesson, model M&P15, 5.56 NATO caliber rifle, bearing serial number SP42781 |
| October 8, 2019 | A Roggio Arsenal, model RA-15, 5.56 caliber semi-automatic rifle, bearing serial number RA09022618; and<br><br>A Crucelegui Hermanos, .32 long caliber revolver, bearing serial number 4191 |
| October 22, 2019 | A Panther Arms, model LR308, .308 caliber semi-automatic rifle, bearing serial number 139662 |
| November 18, 2019 | An SCCY Industries, model CPX-2, 9mm caliber pistol, bearing serial number 7711840 |
| November 30, 2019 | A 9mm caliber firearm bearing no manufacturer markings or serial number (commonly referred to as a "ghost gun") |
| December 28, 2019 | An Areo, model X15, .223 caliber, AR-style semi-automatic rifle, bearing serial number AR14563 |
| January 29, 2020 | A Rock Island Armory, model 206, .38 Special caliber revolver, bearing serial number RIA2038020; and<br><br>A Taurus, model PT809, 9mm caliber semi-automatic pistol, bearing serial number TKM60273 |

1

SENTENCING ALLEGATIONS

2

[21 U.S.C. § 851]

3

[DEFENDANTS ELISEO LUNA, EDUARDO LUNA, PONCE, AND LUIS LUNA]

4      1.    Defendant ELISEO LUNA, also known as ("aka") "Chilo," aka

5  "Crazy," aka "Toca," aka "El Abogado," aka "Roberto Acosta" ("ELISEO

6  LUNA"), prior to committing the offenses alleged in Counts Five,

7  Twenty-Four, and Twenty-Five of this Indictment, had been finally

8  convicted of a serious drug felony as that term is defined and used

9  in Title 21, United States Code, Sections 802(57), 841, and 851,

10  namely, Sale of Controlled Substances, in violation of California

11  Health and Safety Code Sections 11352 and 11370.4(a)(4), in the

12  Superior Court for the State of California, County of Los Angeles,

13  case number BA289503, on or about March 30, 2006, for which defendant

14  ELISEO LUNA served a term of imprisonment of more than 12 months.

15  Defendant ELISEO LUNA was released from a term of imprisonment for

16  that offense within 15 years of the commencement of the offenses

17  alleged in Counts Five, Twenty-Four, and Twenty-Five of this

18  Indictment.

19      2.    Defendant EDUARDO LUNA, aka "Flaco," aka "Cesar Lopez"

20  ("EDUARDO LUNA"), prior to committing the offenses alleged in Counts

21  Five and Nineteen of this Indictment, had been finally convicted of

22  the following serious violent felony and serious drug felony as those

23  terms are defined and used in Title 21, United States Code, Sections

24  802(57), 802(58), 841, and 851:

25          a.    Distribution of Controlled Substances, in violation of

26  Title 21, United States Code, Section 841, in the United States

27  District Court for the District of Nevada, case number 98-CR-292-KJD,

28  on or about September 26, 2000, for which defendant EDUARDO LUNA

served a term of imprisonment of more than 12 months.  Defendant

EDUARDO LUNA was released from a term of imprisonment for that

offense within 15 years of the commencement of the offenses alleged

in Counts Five and Nineteen of this Indictment;

b.    Aggravated Battery, in violation of California Penal

Code Section 243(d), in the Superior Court for the State of

California, County of Los Angeles, case number BA330516, on or about

August 28, 2008, for which defendant EDUARDO LUNA served a term of

imprisonment of more than 12 months; and

c.    Assault with a Deadly Weapon, in violation of

California Penal Code Sections 245(a)(1) and 12022.7(a), in the

Superior Court for the State of California, County of Los Angeles,

case number BA330516, on or about August 28, 2008, for which

defendant EDUARDO LUNA served a term of imprisonment of more than 12

months.

3.    Defendant MARCO ANTONIO PONCE, aka "Largo" and "Mario

Antonio Ponce" ("PONCE"), prior to committing the offenses alleged in

Counts Five, Six, and Thirteen of this Indictment, had been finally

convicted of the following serious drug felony and serious violent

felony as those terms are defined and used in Title 21, United States

Code, Sections 802(57) and 802(58), 841, and 851:

a.    Conspiracy to Distribute and Possess with Intent to

Distribute Cocaine, in violation of Title 21, United States Code,

Section 846, in the United States District Court for the Central

District of California, case number 01-CR-00733-RSWL, on or about

July 2, 2002, for which defendant PONCE served a term of imprisonment

of more than 12 months.  Defendant PONCE was released from a term of

imprisonment for that offense within 15 years of the commencement of

the offenses alleged in Counts Five, Six, and Thirteen of this
Indictment; and

        b.   Possession of a Firearm in Furtherance of a Drug
Trafficking Offense, in violation of Title 18, United States Code,
Section 924(c), in the United States District Court for the Central
District of California, case number 01-CR-00733-RSWL, on or about
July 2, 2002, for which defendant PONCE served a term of imprisonment
of more than 12 months.

    4.   Defendant LUIS ALBERTO LUNA, aka "Pulga," aka "Flea"
("LUIS LUNA"), prior to committing the offenses alleged in Counts
Five, Nineteen, and Twenty of this Indictment, had been finally
convicted of a serious drug felony as that term is defined and used
in Title 21, United States Code, Sections 802(57), 841, and 851,
namely, Distribution of Controlled Substances, in violation of Title
21, United States Code, Section 841, in the United States District
Court for the District of Nevada, case number 98-CR-292-KJD, on or
about September 26, 2000, for which defendant LUIS LUNA served a term
of imprisonment of more than 12 months.  Defendant LUIS LUNA was
released from a term of imprisonment for that offense within 15 years
of the commencement of the offense alleged in Counts Five, Nineteen,
and Twenty of this Indictment.

1           FORFEITURE ALLEGATION ONE

2             [18 U.S.C. § 1963]

3       1.   Pursuant to Federal Rule of Criminal Procedure 32.2, notice

4  is hereby given that the United States of America will seek

5  forfeiture as part of any sentence, pursuant to Title 18, United

6  States Code, Section 1963, and Title 28 United States Code, Section

7  2461(c), in the event of any defendant's conviction of the offense

8  set forth in Count One of this Indictment.

9       2.   Any defendant so convicted shall forfeit to the United

10 States of America the following:

11          (a)  Any interest the convicted defendant has acquired or

12 maintained as a result of such offense;

13          (b)  Any interest in, security of, claim against, or

14 property or contractual right of any kind affording a source or

15 influence over, any enterprise which the convicted defendant has

16 established, operated, controlled, conducted, or participated in the

17 conduct of, as a result of such offense;

18          (c)  Any property constituting, or derived from, any

19 proceeds which the convicted defendant obtained, directly or

20 indirectly, from racketeering activity as a result of such offense;

21 and

22          (d)  To the extent such property is not available for

23 forfeiture, a sum of money equal to the total value of the property

24 described in subparagraphs (a), (b), and (c).

25      3.   Pursuant to Title 18, United States Code, Section 1963(m),

26 any defendant so convicted shall forfeit substitute property, up to

27 the total value of the property described in the preceding paragraph

28 if, as the result of any act or omission of said defendant, the

103

property described in the preceding paragraph, or any portion thereof
(a) cannot be located upon the exercise of due diligence; (b) has
been transferred, sold to or deposited with a third party; (c) has
been placed beyond the jurisdiction of the court; (d) has been
substantially diminished in value; or (e) has been commingled with
other property that cannot be divided without difficulty.

1                        FORFEITURE ALLEGATION TWO

2           [18 U.S.C. §§ 981(a)(1)(C), 924(d) and 28 U.S.C. § 2461(c)]

3           1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal

4    Procedure, notice is hereby given that the United States of America

5    will seek forfeiture as part of any sentence, pursuant to Title 18,

6    United States Code, Sections 981(a)(1)(C), 924(d), and Title 28,

7    United States Code, Section 2461(c), in the event of any defendant's

8    conviction of the offenses set forth in of Counts Two and Three of

9    this Indictment.

10          2.    Any defendant so convicted shall forfeit to the United

11   States of America the following:

12          (a)   All right, title, and interest in any and all

13   property, real or personal, constituting, or derived from, any

14   proceeds traceable to such offense;

15          (b)   All right, title, and interest in any firearm or

16   ammunition involved in or used in such offense; and

17          (c)   To the extent such property is not available for

18   forfeiture, a sum of money equal to the total value of the property

19   described in subparagraphs (a) and (b).

20          3.    Pursuant to Title 21, United States Code, Section 853(p),

21   as incorporated by Title 28, United States Code, Section 2461(c), any

22   defendant so convicted shall forfeit substitute property, up to the

23   value of the property described in the preceding paragraph if, as the

24   result of any act or omission of said defendant, the property

25   described in the preceding paragraph or any portion thereof (a)

26   cannot be located upon the exercise of due diligence; (b) has been

27   transferred, sold to, or deposited with a third party; (c) has been

28   placed beyond the jurisdiction of the court; (d) has been

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1

FORFEITURE ALLEGATION THREE

2

[21 U.S.C. § 853; 18 U.S.C. § 924; 28 U.S.C. § 2461(c)]

3      1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 21,

6  United States Code, Section 853, Title 18, United States Code,

7  Section 924, and Title 28, United States Code, Section 2461(c), in

8  the event of any defendant's conviction of the offenses set forth in

9  any of Counts Five through Twenty-Nine of this Indictment.

10     2.    Any defendant so convicted shall forfeit to the United

11  States of America the following:

12          (a)   All right, title and interest in any and all property,

13  real or personal, constituting or derived from, any proceeds which

14  the defendant obtained, directly or indirectly, from any such

15  offense;

16          (b)   All right, title and interest in any and all property,

17  real or personal, used, or intended to be used, in any manner or

18  part, to commit, or to facilitate the commission of any such offense;

19          (c)   All right, title, and interest in any firearm or

20  ammunition involved in or used in any such offense; and

21          (d)   To the extent such property is not available for

22  forfeiture, a sum of money equal to the total value of the property

23  described in subparagraphs (a), (b), and (c).

24     3.    Pursuant to Title 21, United States Code, Section 853(p),

25  any defendant so convicted, shall forfeit substitute property if, by

26  any act or omission of said defendant, the property described in the

27  preceding paragraph, or any portion thereof: (a) cannot be located

28  upon the exercise of due diligence; (b) has been transferred, sold

to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1                    FORFEITURE ALLEGATION FOUR

2           [18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

3       1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 18,

6   United States Code, Section 924(d)(1), and Title 28, United States

7   Code, Section 2461(c), in the event of any defendant's conviction of

8   the offenses set forth in any of Counts Thirty and Thirty-Two through

9   Forty-Four of this Indictment.

10      2.   Any defendant so convicted shall forfeit to the United

11  States of America the following:

12           (a)  All right, title, and interest in any firearm or

13  ammunition involved in or used in any such offense; and

14           (b)  To the extent such property is not available for

15  forfeiture, a sum of money equal to the total value of the property

16  described in subparagraph (a).

17      3.   Pursuant to Title 21, United States Code, Section 853(p),

18  as incorporated by Title 28, United States Code, Section 2461(c), any

19  defendant so convicted shall forfeit substitute property, up to the

20  value of the property described in the preceding paragraph if, as the

21  result of any act or omission of said defendant, the property

22  described in the preceding paragraph or any portion thereof (a)

23  cannot be located upon the exercise of due diligence; (b) has been

24  transferred, sold to, or deposited with a third party; (c) has been

25  placed beyond the jurisdiction of the court; (d) has been

26  //

27  //

28

substantially diminished in value; or (e) has been commingled with
other property that cannot be divided without difficulty.


                                        A TRUE BILL


                                        /S/
                                        _____
                                        Foreperson


STEPHANIE S. CHRISTENSEN
Acting United States Attorney



SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

JOANNA M. CURTIS
Assistant United States Attorney
Chief, Violent & Organized Crime
Section

DAMARIS DIAZ
CLAIRE KELLY
Assistant United States Attorneys
Violent & Organized Crime Section

110